## In re OLIVER.

No. 6046.   Decided April 12, 1939.   (89 P. 2d 229.)

1

*J. Allan Crockett,* of Salt Lake City, for plaintiff.

*E. M. Bagley* and *L. O. Thomas,* both of Salt Lake City, for defendant.

PRATT, Justice.

The Board of Commissioners of the Utah State Bar refused to recommend David H. Oliver for reinstatement, after his suspension for non-payment of dues. Oliver appeals. His application for reinstatement did not comply in formalities, with the requirements of Section 71 of Rule VII of the "Revised Rules of the Utah State Bar Governing Professional Conduct and Discipline." Apparently this was waived by the Board, as they proceeded to the merits of his case. He tendered the necessary dues and penalties.

The Board's refusal was upon the following ground:

"After discussing the matter at length, the Board of Commissioners was of the opinion that Mr. Oliver has not met the requirement imposed by the rules to entitle him to reinstatement and his petition was denied." (Taken from the Board minutes.)

The record indicates that the requirement they had in mind was that of Section 91, Rule IX, governing *admission* to practice:

"Every applicant must be of good moral character. Investigations in reference to the moral character of applicants may be informal, but

shall be thorough, with the object of ascertaining the truth. Neither the hearsay rule, nor any other technical rule of evidence, need be observed, but an applicant shall be advised of any and all information received by the Board adversely affecting his moral character upon which a denial of recommendation by the Board is based, and he shall be given a reasonable opportunity to rebut or explain the same. The applicant shall have the burden of proving that he is possessed of good moral character, that he is entitled to the high regard and confidence of the public, and of removing any and all reasonable suspicion of moral unfitness." See also Sec. 6-0-10, R. S. U. 1933.

This rule is made applicable to *reinstatement,* by Section 73, Rule VII, of the Revised Rules first above referred to, which reads as follows:

"The Board of Commissioners in its discretion may refer the petition for reinstatement to an Investigating Committee and to the Committee of Bar Examiners for an investigation of the moral, general educational and legal qualifications of the petitioner for the practice of law. Reinstatement shall not be recommended except upon an affirmative showing to the satisfaction of the Board of Commissioners that the petitioner possesses moral qualifications and learning in general education and in law as required at the time for Admission to the Practice of Law in the State of Utah; *provided that any person who has been suspended or disbarred for a period of three years or more shall be required to take the regular bar examination,* except persons who have relinquished their membership in the Utah State Bar because of absence from the State of Utah, and who, during such absence, were engaged in the practice of law in other states as their principal occupation and means of livelihood." (Italics added.)

Mr. Oliver complains: (1) That the action of the Board does not conform to law and the rules of the Bar Association; and (2) that the record does not show any legal basis for the refusal of the Board to recommend his reinstatement.

He was an employee of the railroad as well as an attorney. He was discharged from that employment for obtaining a pass under false pretenses. We invite attention to Section 1 of the Interstate Commerce Act of Congress (Paragraph 7, Sec. 1, Title 49 U. S. C. A.):

"* * * Any common carrier violating this provision shall be deemed guilty of a misdemeanor and for each offense, on conviction, shall pay to the United States a penalty of not less than $100 nor more than $2000, and any person, other than the persons excepted in this provision, who uses any such interstate free ticket, free pass, or free transportation shall be subject to a like penalty."

He obtained a pass for himself and wife. The woman in the case was not his wife although each claimed that they had intended marrying, but that Oliver called it off. The pass was forwarded to her in Chicago. She used it to come to Ogden, Utah, traveling part of the way, as it is claimed, with Oliver. They registered at a hotel in Ogden as Mr. and Mrs. D. H. Oliver. In the early hours of a certain morning, they were in their room together and trouble occurred between them. The police were called. They took them to the station, carrying Oliver as he refused to stand up or walk when it was necessary. He was tried for disturbing the peace. The prosecution was by the City. The woman testified against Oliver. While on the witness stand she stated she was his wife. Immediately he objected to any further testimony from her as incompetent. It does not appear from the record that he knew ahead of time she was going to so testify, nor does it appear therefrom that they concocted this scheme between them for his protection. In fact, after consultation with the city attorney she changed her story, denied she was his wife, and the trial proceeded to a finding of guilty against him. He was fined. Oliver acted as his own attorney in the trial. When she told the truth, he raised no further objection based upon marital relationship.

Counsel for the Board characterizes his objection to her testifying as follows: "Adopting and acquiescing in her perjury Oliver interposed the objection that her further evidence was not admissable against him because she was his wife."

This statement is apt to be confusing. The record does not show that Oliver made any statement that she was his wife. The question was "You are the wife of the defen-

dant?" Her answer: "Yes." Then Oliver objected. Just what his words were does not appear.

We should look as this objection as of the time it happened and not after it is all over, with a finding of guilty staring us in the face. At that time Oliver was presumed innocent, and for all we would have then known, might have been found not guilty. He was the defendant with a constitutional right to remain silent if he so desired—his oath as an attorney did not require of him a waiver of this constitutional right. When the woman spoke the truth about their lack of marriage relationship he made no effort to continue the false front originally advanced by her, although it might have been much to his advantage to have done so, as he and she were the only two present within whose knowledge the actual truth lay. But, be these facts as they may, we offer this suggestion. Why not characterize his objection as follows: Assuming her evidence to be true, she is incompetent to testify.

This is not a strange thought to the law. A defendant charged with rape objects to the introduction of evidence upon the ground that the information does not state a public offense. For the purpose of the objection, but for no other, he assumes the truth of the allegations of the information. If his objections were sustained, the allegations of that information could not, subsequently, be used against him as an admission by him against his interest, simply because he demurred to them. If his objections were overruled, most assuredly he would not thereby have entered a plea of guilty to the offense charged. He might contradict such of the allegations as were shown by the evidence of the prosecution, if he so desired. Assume the city judge in the Oliver case had overruled his objection. Oliver would not have been bound by the woman's statement that she was his wife, simply because he objected to her testifying. Objections to the introduction of testimony are procedural matters which in effect assume but do not admit the truth of the proposed

*testimony.* We do not concur in counsel's characterization of Oliver's conduct at that trial.

However, the record does not disclose the full details of this incident. It may be that upon a proper hearing it will be disclosed that Oliver's conduct in making the objection was such as to be characterized improper.

In addition to that we have just recited, Oliver, by his own statement had been in other trouble. He once shot at his landlady who, with her husband, was trying to enter his room to oust him after she had given him verbal notice to quit. He had refused to obey the notice as it did not conform to law. This, however, occurred some years back and prior to his admission to the Utah State Bar.

One of the matters of which Mr. Oliver complains is the lack of a proper notice of hearing, and a proper hearing, of his petition for reinstatement. Section 72, Rule VII, of the Revised Rules referred to above, reads as follows:

"The Board of Commissioners shall fix a time and place for the hearing of the petition and the Secretary shall mail notice thereof to the petitioner and to the members of the Prosecuting and Disciplinary Committees interested, and to such other persons as the Board of Commissioners may designate. On or prior to the date of the hearing any person may file printed or typewritten statements for or against the granting of the petition."

Assuming this section applicable to a petition for reinstatement after suspension for non-payment of dues, there is no question but that the Board did not properly carry it out. Their minute entry of February 24, 1938, shows that his petition was referred to the secretary along with the Committee of Bar Examiners, for investigation, the investigation to involve the question of his moral and legal qualifications. No hearing was had, but the secretary wrote letters of inquiry to police officers and others. March 31, 1938, the minute entry shows a denial of the petition pending further investigation. Oliver learned of this through the Bar Bulletin. He contacted the secretary of the Bar, and was given permission to appear before the Board at its

next meeting. Thereafter he appeared voluntarily on two occasions and answered questions. At these times he made no objection to the lack of notice of hearings but he did ask who had made charges against him and the nature of those charges. He received no information upon this point as no formal charges were preferred. Between these appearances the Board referred the matter to Mr. Thomas, the investigating officer of the Bar, who interviewed numerous witnesses and reported in writing the substance of their statements. It does not appear that Mr. Oliver was afforded any opportunity to present witnesses to Mr. Thomas, nor to cross-examine those examined by the investigator. See Sections 6-0-14 and 6-0-15, R. S. U. 1933.

One is somewhat at loss to account for the procedure adopted by the Commission in this case, especially in the face of Section 72 above quoted. It may be they concluded the section was not applicable to reinstatement upon suspension for non-payment of dues. As a matter of fact we think it is not. A petition for reinstatement from a suspension for non-payment of dues raises no question as to moral qualifications, but is strictly one of dues and penalties. We shall discuss this more fully later. The Board, however, brought the moral question into the picture, and, having done so, they should have afforded applicant a proper hearing upon notice. This leaves, then, the question as to whether or not applicant by his appearances without objection waived notice. We think he did. *Barton* v. *State Bar of California,* 209 Cal. 677, 289 P. 818.

We have stated that Section 72 has no application to a petition for reinstatement for non-payment of dues. There is an exception in the case of legal qualifications which appears hereafter. The fees and penalties are fixed sums. It is a matter of figures as to whether or not applicant has complied with the requirements. Moral qualifications are not in issue. We wish to discuss this last statement upon two bases: (1) Its merits; (2) the provisions of Sections 71, 72, and 73. Section 71 reads as follows:

"Reinstatement following suspension for non-payment of license fees, or suspension or disbarment for unprofessional conduct, shall be by petition in writing, verified by the petitioner, addressed to the Board of Commissioners of the Utah State Bar and filed with the Secretary; the petition shall set forth the name, age, residence and address of the petitioner, his residence and occupation during the period of suspension or disbarment, the cause of the suspension or disbarment, a concise statement of the facts claimed to justify reinstatement, and a statement that the petitioner has complied with the order of suspension or disbarment; if the disbarment or suspension was based upon professional misconduct, the petitioner shall file with his petition copies of the Findings and Recommendations. The petition for reinstatement must be accompanied by a filing fee of $10.00, and in addition by the delinquent license fees and penalties if the suspension was for non-payment of license fees."

Membership in a Bar contemplates two things: (1) The status of being a member; and (2) the right to exercise the privileges of membership. This is illustrated by active and inactive memberships such as are provided by Sec. 6-0-23, R. S. U. 1933. It is recognized as to judges, who are members, but as they are prohibited by statute (Sec. 20-6-2, R. S. U. 1933) from practicing law they are relieved of paying dues (Sec. 6-0-20, R. S. U. 1933). We quote an extract from Section 6-0-24, R. S. U. 1933:

"Any person * * * whose right or license to practice * * * shall have *terminated* * * * *by* * * * *failure to pay his license fee* * * * who practices or assumes to act or hold himself out to the public as a person qualified to practice or carry on the calling of a lawyer within this state, is guilty of an offense, and shall be fined not to exceed $500, or be imprisoned for a period of not to exceed six months, or both, *and, if he shall have been admitted to practice law, he shall in addition be subject to suspension under the proceedings provided by this title.*" (Italics added).

Note the italicized words. If the suspension for the non-payment of a license fee meant that the attorney was no longer a member of the Bar, then those words are meaningless. See also 7 C. J. S., Attorney and Client, page 813, § 40; *State Board of Examiners in Law* v. *Byrnes*, 97 Minn. 534, 105 N. W. 965.

"Disbarment" is the severance of the status and the privileges. "Suspension" is the temporary forced withdrawal from the exercise of office, powers, prerogatives, or privileges as a member. Webster's Dictionary.

Let us apply these principles to the Oliver case. He was admitted to practice in 1931. At that time he assumed the burden of establishing moral qualifications. He was successful. Those qualifications remain with him so long as his status (as distinguished from his right to exercise privileges) remains with him, or until an order is made by competent authority suspending him for conduct indicative of a lack of those qualifications. That status may not be severed, nor such a suspension order made, except upon hearing after due notice. 7 C. J. S., Attorney and Client, § 27, page 768. A suspension for non-payment of dues comes automatically. No hearing is contemplated. Secs. 61 & 62, Rule VI, Professional Conduct and Discipline; also Sec. 6-0-20, R. S. U. 1933. It terminates solely the right to exercise the privileges of the status of a member. *The termination of that right for such reasons casts no reflection upon the member's moral qualifications.* If the suspension period is of sufficient length his educational qualifications may become an issue as hereafter mentioned. Assume we should hold that by such a suspension applicant lost the benefit of once having had it determined that he possessed good moral qualifications, what would be the effect? Simply this: The honest, qualified practitioner who was not a "business getter" would suffer the humiliation of having to prove his qualifications because he did not have money enough to pay his dues; whereas the "ambulance chaser" could assume the role of offended dignity and require the association to prove he lacked them—a premium for dishonesty.

Now what about the sections of the rules we have quoted. In Section 73, the reference of the petition for reinstatement to an investigating committee or to the committee of Bar

Examiners has, except as hereinafter stated, application to either a disbarment or a suspension for conduct indicative of a lack of moral or a lack of legal qualifications. (A lack of moral qualifications to be submitted to the investigating committee; a lack of legal qualifications to be submitted to the examiners.) It is to be noted that, by the last few lines of that section, legal qualifications may become a question after a suspension for non-payment of dues for a period of three years or longer. This is the exception above referred to and apparently was adopted upon the theory that an attorney, in that length of time or longer, without active practice, may not be able to do justice by his client. Under such circumstances the rule provides that he may be examined to see if he has kept up in his knowledge of the law. After the three-year period an application for reinstatement from suspension for non-payment of dues may be submitted to the Committee of Bar Examiners for such an examination. But notice that there is no provision whereby the lapse of time raises a question of applicant's moral qualifications.

In the present case the three-year period had not elapsed; thus Mr. Oliver's application raised neither an issue of legal qualifications nor an issue of moral qualifications; no hearing was necessary; and Section 72 was not applicable.

But what of the individual who, while in suspension for non-payment of dues, conducts himself in such a manner as to raise a question about his moral qualifications? He still retains his membership status and is therefore subject to being tried. That he is already under suspension is immaterial. *State Board of Examiners in Law* v. *Byrnes, supra.* Naturally there is the disadvantage to this that the Bar must assume the burden of proving his lack of moral qualifications; but this is in line with our accepted theory of trials. It is far better, after a member has established his moral qualifications, as he does upon admission to the Bar, to presume that those qualifications remain with him until such time as they are taken away by

proper procedure, than to presume ill of him and require him to overcome the last presumption.

What about the member suspended for misconduct—may he, upon his application for reinstatement, require the association to prove a lack of moral qualifications to prevent his reinstatement? Not if he were properly suspended after a hearing upon due notice. His order of suspension may by its terms require certain conditions precedent to reinstatement; but whether it does or not, he is required to purge himself of all conduct of a nature of that which was the subject of his suspension. 7 C. J. S., Attorney and Client, § 41, page 818; *Kepler* v. *State Bar of California,* 216 Cal. 52, 13 P. 2d. 509; 2 R. C. L. Sec. 205, page 1113.

Little need be said about disbarment. The severance of the status as well as the right to exercise the privilege of that status places the party in the same position as if he had never been admitted to practice. When he seeks readmission to the bar he must comply with the rules upon admission, and any others, that his disbarment order or previous conduct may contemplate. *Kepler* v. *State Bar of Cal.,* supra.

We probably have covered these matters more fully than the issues justified. We have done so, however, with the hope that what has been said will be of aid in the future.

The record before us discloses that not one person made a statement under oath. The greater part of the matters were hearsay in the form of a written report of the investigating officer. Some are in the form of letters in answer to those sent out by the Bar secretary. Oliver requested that he have an opportunity of presenting witnesses upon his own behalf. Section 42, Rule IV, of the disciplinary rules calls for hearings to be under oath or affirmation. Section 43 provides that the attorney shall have opportunity to produce evidence in his own behalf and to cross-examine witnesses called against him. Rule V calls for findings and conclusions upon the hearing. See also Sections 6-0-14, 6-0-15, 6-0-16, and 6-0-17 of R. S. U. 1933.

None of these procedural requirements appear in the record. Should we, then, in the exercise of our inherent power to discipline an attorney proceed to final determination of these matters without first affording Mr. Oliver a proper hearing upon notice? We think not. 7 C. J. S., Attorney and Client, § 27, page 768. To say the least, he should be afforded the opportunity of producing witnesses in mitigation of any punishment that might be meted out to him.

Upon the merits of his application our decision contemplates the reinstatement of Mr. Oliver if he tenders the necessary dues and penalties. However, the matters submitted to the Board of Commissioners are such as to justify investigation.

In view of the fact that, upon the shoulders of this court rests the ultimate decision of the merits of those matters it would seem rather circuitous to return this case to the Bar commissioners and place upon their shoulders the burden of filing a complaint against Mr. Oliver for the purposes of such an investigation. For that reason we direct that he appear before investigating committee "A" of the third division of the Utah State Bar, whose members are hereby appointed referees in this matter; and any three of whom may act in the premises, to show cause, if any he has, why he should not be disbarred or otherwise disciplined in the matter. The clerk of this court shall ascertain a date when that committee is available to hear the matter, which shall be not later than May 31, 1939, except upon good cause shown in writing by Mr. Oliver, and shall issue a citation to be served upon him, together with a copy of this decision, directing his appearance in conformity with this order. Such service shall be not less than ten days prior to the day of hearing. Upon the completion of that hearing said committee shall certify to this court the transcript of the testimony taken before them, together with their recommendation in the premises. It is requested that the Board of Commissioners furnish counsel to prosecute the case. Mr. Oliver may, if he desires, withhold his tender of dues and penalties

until after the termination of the hearing. Authority for this form of procedure may be found in the following cases: *In re Hanson*, 48 Utah 163, 158 P. 778; *In re Marsh*, 42 Utah 186, 129 P. 411; *In re Platz*, 42 Utah 439, 132 P. 390; 7 C. J. S., Attorney and Client, §§ 28, 30, page 774; *In re Investigation by Bar Association of Hudson County*, 109 N. J. L. 275, 160 A. 809; *In re Disbarment Proceedings*, 321 Pa. 81, 184 A. 59; *Snyder's Case*, 301 Pa. 276, 152 A. 33, 76 A. L. R. 666; *In re Saric*, 197 Ind. 1, 149 N. E. 434; Section 6-0-18, R. S. U. 1933, reserves to the Courts their power of disbarment and discipline. See also *In re Barclay*, 82 Utah 288, 24 P. 2d 302.

It is the intent of this order that the hearing herein provided shall be limited to matters pertaining to the obtaining and use of the pass; the conduct of applicant leading to his arrest and conviction of disturbing the peace, including his actions during the trial, and such character evidence as the prosecution or defense may desire to introduce. The investigating committee may exercise its own judgment as to what number of witnesses may be reasonable upon the matters in inquiry. By this decision we express no opinion upon the merits of the facts herein disclosed as to whether or not they constitute sufficient grounds for either disbarment or suspension. That question is reserved for consideration upon the report of the referees herein named.

MOFFAT, C. J., and WOLFE, LARSON, and McDONOUGH, JJ., concur.