No. 46,581

STATE OF KANSAS, *Petitioner*, v. ELMER J. SCHUMACHER, *Respondent*.
(519 P. 2d 1116)

Opinion filed March 2, 1974.

*Curt T. Schneider*, assistant attorney general, argued the cause, and *Vern Miller*, attorney general, was with him on the brief for the petitioner.

*F. G. Manzanares*, of Topeka, argued the cause and was on the brief for the respondent.

*Per Curiam:* This is a proceeding in contempt in which the respondent, an attorney-at-law, is charged with willful disobedience of an order of this court suspending him from the practice of law. That suspension was for a period of six months from and after November 4, 1972. *State v. Schumacher*, 210 Kan. 377, 502 P. 2d 748.

After the accusation in this proceeding was filed the court appointed the Honorable Fred N. Six, of Lawrence, as its commissioner to receive evidence and make a report of his recommended findings of fact and conclusions of law. His report was filed on December 3, 1973, together with the transcript of 752 pages and the original exhibits.

As his response to the commissioner's report respondent has filed a document signed by him and his counsel in which he states:

"1. That he will not take exception to the Commissioner's Findings of Fact.

"2. That with respect to the Commissioner's Conclusions of Law and Recommendations, he submits himself to the mercy of the Court."

On oral argument respondent reaffirmed this position, suggesting only that his conduct was the result of ignorance rather than of a willful intent to violate this court's order. The commissioner's findings and conclusions are as follows:

1. Respondent was suspended from the practice of law for a period of six months, from and after November 4, 1972, by order of the Supreme Court of the State of Kansas as reported in 210 Kan. 377 (1972).

2. Respondent was fully aware of the period of this suspension. The following findings relate to the period of suspension.

3. (*a*) L. J. Grant [a Topeka attorney] entered into an informal agreement with the Respondent to represent before the courts those clients who had retained the Respondent.

(*b*) During the period of suspension in 1972, L. J. Grant depended on Respondent's secretary [June Shipley] to inform Grant as to when cases he was handling from Respondent would come up.

(*c*) L. J. Grant, an attorney at law, had an office in his home at 1257 Garfield, Topeka, Kansas. Grant did not office with Respondent. Grant was admitted to practice in 1939. Except for

the first year of practice his office has been in his home. He didn't have enough money so he had to keep his office in his home. Grant's home-office had no professional sign outside. Grant did not employ a secretary. He had handled his own secretarial work for the past several years.

(d) L. J. Grant did not pay June Shipley during the period of suspension for her secretarial services.

(e) Grant had a phone at his home-office. However, during the period of suspension client calls were made to Respondent's law office. Respondent's secretary, June Shipley, would call L. J. Grant and he would call the client or meet the client at Respondent's office which was open daily. The same procedure was followed by June Shipley when a new client walked into Respondent's office.

(f) Grant did not use any other attorneys' stationery. If June Shipley was out of his stationery, she was to type his name on blank stationery.

(g) Grant did not feel that the fees paid for the cases he was working on, that Respondent was helping him with, should be any concern of his, either as to amount or method of payment.

(h) Grant signed a lot of papers that were just brought up for his signature.

(i) Grant liked to talk to Respondent before Grant talked to the clients, to be filled in on what Respondent thought the facts were.

4. Grant and the Respondent never entered into a formal agreement for the use of the Respondent's office, nor arranged for the payment of any rent or expenses for any use that L. J. Grant may have had of Respondent's office. Respondent's office was used by Respondent and Grant to confer with each other on the facts and information relating to Respondent's cases handled by Grant.

5. Grant never entered into a formal employment agreement with June Shipley, Respondent's secretary, for the period of Respondent's suspension.

6. All files of Respondent's cases remained in Respondent's office. Case files of clients worked on by L. J. Grant remained in Respondent's office. L. J. Grant did not keep any files at his home-office.

7. June Shipley remained in the employ of Respondent throughout his suspension. A reciprocal working arrangement was in

existence prior to November 4, 1972. A working arrangement was continued during the period of suspension.

8. Respondent kept his office open to the general public during normal working hours throughout the period of his suspension.

9. Respondent's office was easily recognizable to the general public by an exterior sign which identified Respondent as an attorney qualified to practice law in Kansas. The exterior sign was not removed, but was displayed throughout the entire period of Respondent's suspension. There were no other attorneys' names on the outside of Respondent's office.

10. During the suspension period, Respondent was present on occasions in the various courts of Shawnee County, always remaining behind the bar. He conversed with clients and witnesses associated with cases Grant represented before the courts, and who had retained Grant as a result of his informal association with the Respondent. The Respondent personally served various pleadings and other legal papers to the court clerks and opposing counsel.

11. On occasions during the suspension, Respondent offered advice and provided information to L. J. Grant during the course of courtroom proceedings with reference to various cases which the Respondent had transferred to Grant.

12. During the period of suspension, new cases were referred to Grant which became available because of the representation to the general public that Respondent's office gave.

13. Grant did not determine the fees to be charged to such clients for services rendered. Grant did not bill any clients. He was not paid directly by clients, but, rather, received payments from Respondent, either in cash or by personal check. In the *Tommer* case Grant told the clients to send the fee to Respondent's office and Grant would pick up his money there.

14. Grant handled approximately fifty cases which are related to his association with Respondent. Several of these cases were not pending at the time of Respondent's suspension, but became available during the period of suspension because Respondent's office was open.

15. (a) As a condition for accepting Respondent's cases, Grant required the Respondent to agree to assist him. Grant told Respondent:

"In view of the fact that I wasn't able to get around and run these errands and do these outside stuff, I said, 'It's hard enough

job for me to take care of just your court appearances,' and I said, 'You'll have to do the rest of it or else you'll have to get somebody else to do it. I can't run these errands, and I can't do this and build up this and that and the other for you. You'll have to do that yourself,' and he understood that thoroughly, and that's why he got busy."

(*b*) Grant did not confer with Respondent or clients in Grant's home-office but in Respondent's office.

(*c*) Grant did not prepare any of the pleadings in the 10th circuit matter. He knew nothing about the case.

(*d*) Grant didn't read one-half the papers brought to him to sign by June Shipley. Shipley would say "Here is one to sign" and Grant would sign them and let them go.

(*e*) June Shipley never prepared a pleading without someone dictating it to her, except for a form such as a notice of appeal.

16. Respondent retained all prepaid fees advanced by clients prior to his period of suspension. Instead of returning unearned fees to his clients as required by the rules of this court, 205 Kan. lxxxii, [DR 2-110 (A) (3)]. Respondent subsequently paid part or all of such sums to L. J. Grant for services rendered by him. Grant did not know what the clients had paid Respondent, nor did he ask Respondent.

17. Grant and Respondent discussed the circumstances surrounding their association with reference to Respondent's suspension and potential ramifications of Respondent's participation in cases transferred to Grant.

18. During the period of suspension, June Shipley continued to prepare a brief written by Respondent for a case pending at the 10th Circuit Court of Appeals. This matter was not entrusted to another attorney during the period of suspension, but was advanced under the control, and through the efforts, of Respondent and his employee, June Shipley.

19. *In the Matter of Bobby Lewis:* (*a*) Lewis employed Respondent prior to the suspension.

(*b*) Respondent never informed Lewis or his uncle, Lyle Clark, with whom Lewis lived, of his suspension nor advised either Lewis or Clark to retain other counsel until the day of the trial, March 6, 1973.

(*c*) The Respondent kept his office open and permitted his employee, June Shipley, to prepare correspondence concerning legal matters in the Lewis case which was subsequently sent

through the mails to the court, to other counsel, and to Bobby Lewis. Exhibit No. 3 (letter to Gerald Skor, attorney at law, December 6, 1972) was prepared by Respondent's employee [June Shipley], and Lewis came to the office of Respondent to sign it. Exhibit No. 7 (Letter to Bobbie Lewis, April 19, 1973, on legal stationery of Respondent). This occurred during the period of Respondent's suspension.

(d) Lewis first met L. J. Grant on the date of trial, March 6, 1973, and until this time was not aware of any other counsel except Respondent.

(e) Respondent's employee [June Shipley] prepared Lewis Exhibit No. 8. (Letter to Judge Hazlett, February 28, 1973).

(f) The documents making up Lewis Exhibit No. 6 were mailed, during the period of suspension, in an envelope bearing Respondent's name and return address which contained the description, "Attorney at Law."

(g) Respondent, in a telephone conversation with opposing counsel, E. Soule, indicated that another attorney would be taking over the case, but nevertheless continued to discuss matters of a legal nature with Soule concerning the disposition of the matter. See Lewis Exhibit 9. (Letter from Edward B. Soule to Respondent, December 14, 1972).

(h) During the trial on March 6, 1973, Respondent was present in the courtroom behind the bar. During the course of the proceeding, Respondent passed at least two notes to L. J. Grant. At least one of those notes contained relevant facts to assist Grant in the prosecution of the trial. Respondent brought information to Grant relative to the case, which Grant felt, he (Grant) needed to know.

(i) Grant did not dictate or prepare any pleadings.

(j) Grant did not read the Journal Entry of Judgment. (Exhibit 6) He just signed it without reading it.

20. *In the Matter of Smith v. Harrison:* (a) Respondent was the attorney for Smith at litigation prior to the period of his suspension.

(b) Judge E. N. Vickers, prior to November 4, 1972, directed the parties to submit briefs on various points of law relevant to the proceeding.

(c) Respondent's brief was not timely made and Judge E. N. Vickers, after November 4, 1972, again directed Respondent to

submit the required brief. Judge Vickers was aware that Respondent had been suspended.

(*d*) Respondent had not at that time arranged for other counsel to assume the responsibility for representing this client.

(*e*) Respondent prepared this brief during the period of his suspension and filed it on January 15, 1973.

(*f*) Respondent did not, thereafter, arrange for other counsel and, nearly two months later, approved a Journal Entry of Judgment on March 13, 1973, while he was still suspended. (Resp. Exhibit D.)

(*g*) Respondent approached opposing counsel, Harold Doherty, on an occasion in January, 1973, concerning an appeal and settlement of the matter. Respondent also inquired about payment of a medical claim arising out of the controversy and stated that if payment was not forthcoming, further legal action would be undertaken.

(*h*) Notice of appeal was filed on March 2, 1973, and was served on Harold Doherty personally by the Respondent. The notice of appeal bore the signature of L. J. Grant. Mr. Doherty had had no conversation or communication from Grant in regard to the case prior to this time.

(*i*) Grant did not prepare Exhibit 16 (Statement of Points), Exhibit 15 (Motion for Stenographic Record), or Exhibit 17 (Designation of Contents of Record on Appeal—Resp. Ex. F is same as Ex. 17).

(*j*) Respondent prepared Exhibit 16 and Exhibit 17 (F). No one else but Respondent was working on case. Grant did not work on the case.

(*k*) Grant signed Exhibits 15, 16 and Exhibit 17 (F).

(*l*) Grant did not take any of the file to his office. He never examined the file. The file remained in Respondent's office.

(*m*) Exhibits 15, 16 and 17 were prepared in Respondent's office.

(*n*) A transcript of the trial record was ordered. Respondent signed a check on his office trust account for $80.00. $17.00 or $18.00 was returned to Grant by Art Halleran [the court reporter]. Grant gave this money to Respondent.

(*o*) Respondent prepared the record on appeal at Grant's request. Respondent was not paid by Grant for this work. Grant told Respondent he would have to do ". . . the leg work, and any writing that we have to do . . . because I can't."

21. *In the Matter of Archie Lemert:* ( *a* ) Respondent approached Shawnee District Attorney, D. Morrison, in December, 1972, in the hall of the Shawnee County Courthouse, and discussed what could be done with the charges against Lemert in exchange for full restitution.

( *b* ) Grant subsequently inquired into substantially the same matter on December 29, 1972.

( *c* ) Both Respondent and Grant were present when Lemert entered a plea on December 29, 1972.

( *d* ) Both Respondent and Grant were present at the sentencing on January 19, 1973.

( *e* ) In March of 1973, Respondent had a brief conversation with D. Morrison concerning what, if anything, could be done about Lemert's sentence.

22. *In the Matter of Tommer:* A $500.00 retainer was sent by clients to the office of Respondent. Only $200.00 of the retainer was received by Grant, and the remainder was retained by Respondent and used for office expenses.

## COMMISSIONER'S CONCLUSIONS OF LAW

The Commissioner concludes, beyond a reasonable doubt, that the Respondent, Elmer J. Schumacher, is: (1) guilty of willful disobedience of the order of this court to forebear in the practice of law; (2) is in contempt of his suspension order and (3) is guilty beyond a reasonable doubt of the contempts charged in the accusations in the following violations.

1. By keeping his office open to the general public at 1409 W. 15th Street, Topeka, Kansas, Respondent represented that he was capable of transacting legal matters. Such activity constitutes the practice of law.

2. By permitting his sign to remain visible to the general public, Respondent held himself out to the public as capable of transacting legal matters. Such activity constitutes the practice of law.

3. By permitting legal matters to be transmitted under his letterhead or with his return address, Respondent represented to the general public that he was capable of transacting legal matters. Such activity constitutes the practice of law.

4. Respondent's continuing association in the Bobby Lewis matter constitutes the practice of law.

5. Respondent's continuing association with *Smith v. Harrison* constitutes the practice of law.

6. Respondent's activity in the matter of Archie Lemert constitutes the practice of law.

Our examination of the record reveals ample support for the findings and conclusions of the commissioner, and they are adopted by the court. As to the legal effect of respondent's conduct the commissioner filed the following memorandum opinion:

## I. *What is the Practice of Law?*

Although it may sometimes be articulated more simply, one definition has gained widespread acceptance, and has been adopted by this Court:

A general definition of the term frequently quoted with approval is given in *Eley v. Miller*, 7 Ind. App. 529, 34 N. E. 836, as follows:

"As the term is generally understood, the practice of law is the doing or performing of services in a court of justice, in any matter depending therein, throughout its various stages, and in conformity to the adopted rules of procedure. But in a larger sense it includes legal advice and counsel, and the preparation of legal instruments and contracts by which legal rights are secured, although such matter may or may not be depending in a court." *State, ex rel., v. Perkins*, 138 Kan. 899, 907, 908, 28 P. 2d 765 (1934).

The court, in *Perkins*, also pointed out that [o]ne who confers with clients, advises them as to their legal rights, and then takes the business to an attorney and arranges with him to look after it in court is engaged in the practice of law." 138 Kan. at 908. The quotation from the *Eley* case has been adopted as the general rule in 7 C. J. S., *Attorney and Client*, § 3g (1937).

A more recent source defines the practice of law as "the rendition of services requiring the knowledge and application of legal principles and technique to serve the interests of another with his consent." *R. J. Edwards, Inc. v. Hert*, 504 P. 2d 407, 416 (Okla., 1972).

It is clearly the prerogative of the Supreme Court to define the practices of law:

It is unnecessary here to explore the limits of judicial power conferred by [Article 3, Sec. 1, of the Kansas Constitution], but suffice it to say that the practice of law is so intimately con-

nected and bound up with the exercise of judicial power in the administration of justice that the right to regulate the practice naturally and logically belongs to the judicial department of the government. (*In re Integration of Nebraska State Bar Ass'n,* 133 Neb. 283, 275 N. W. 265, 114 A. L. R. 151.) Included in that power is the supreme court's inherent right to prescribe conditions for admission to the Bar, to define, supervise, regulate and control the practice of law, whether in or out of court, and this is so notwithstanding acts of the legislature in the exercise of its police power to protect the public interest and welfare. (*Martin v. Davis,* 187 Kan. 473, 478-479, 357 P. 2d 782 (1960).

See, *In re Hanson,* 134 Kan. 165, 170, 5 P. 2d 1088 (1931); *State v. Rose,* 74 Kan. 260, 85 Pac. 803 (1906); and *State v. Blase,* 208 Kan. 969, 494 P. 2d 1224 (1972).

## II. *What is the Status of a Suspended Attorney?*

7 Am. Jur. 2d, *Attorneys at Law,* § 69 (1963) states that "[a]ttorneys who are under suspicion are required to comply with the terms of the decree suspending them in such a manner that there will be no ground for suspension on the part of the bar or the public that the decree of the court is not being exactly observed in its letter and spirit." Although the text quotation articulates the rule in the language of *In re Lizotte,* 32 R. I. 386, 79 A. 960 (1911), an even earlier case, *In re Byrnes,* 97 Minn. 534, 105 N. W. 965 (1906), describes the status of a suspended attorney this way:

Respondent still holds his office as an attorney and is subject to the jurisdiction of the court. His former suspension operates simply to deprive him temporarily of the right to practice his profession.

*Byrnes* is consistent with the dictionary approach taken in *In re Oliver,* 97 Utah 1, 89 P. 2d 229, 233 (1939): " 'Suspension' is the temporary forced withdrawal from the exercise of office, powers, prerogatives, or privileges as a member. Webster's Dictionary."

Just as every lawyer should avoid even the appearance of professional impropriety, a suspended attorney should avoid the appearance of failure to comply with the court's order. The Nebraska Supreme Court has suggested that this means he must refrain from the things which he did as an attorney even though he might legally do them as a layman:

It seems clear to us that the doing of such work is within the province of a lawyer to do. It is properly identified as the practice of law, whether or not it might under some circumstances be properly performed by others not admitted to the bar. An order of suspension deprives the suspended lawyer from performing any service recognized as the practice of law. . . . A suspended lawyer will not be heard to say that services recognized as within the practice of law were performed in some other capacity when he is called to account. *State ex rel. Nebraska State Bar Assn. v. Butterfield*, 172 Neb. 645, 649, 111 N. W. 2d 543 (1961).

An example of what is apparently exemplary behavior on the part of a suspended attorney is found in *In re Stoldt*, 37 N. J. 364, 366, 181 A. 2d 364 (1962):

The proof likewise reveals that immediately upon suspension, Stoldt withdrew from the office where he had been engaged in the practice of law with his son, and removed all evidence that he was an active member of the profession, or in any way associated with his son at that address or elsewhere. Since the date of the order of this court, his son has occupied the office exclusively and *Stoldt has never entered it.* Moreover, he notified all his clients that he was no longer engaged in the practice of law. There is no proof that since March 20, 1961, he has acted in any way in the professional capacity of a member of the bar. (Emphasis added.)

III. *Does the Failure to Remove his Name From his Letterheads and Outside his Office, Place a Suspended Attorney in Contempt?*

Yes. "The use of the terms 'lawyer,' 'attorney at law,' 'counselor,' on letterheads or elsewhere by one unauthorized to practice law is not justified." *State, ex rel., v. Perkins,* 138 Kan. 899, 908, 28 P. 2d 765 (1934).

In *Lizotte*, supra, "it appeared that the respondent, after the decree of suspension, retained the sign upon his office door, reading 'M. L. Lizotte, Attorney at Law. . . .'" He also "used and sent through the mails stationery and envelopes bearing the same printed heading as that used by him before his suspension, in which heading he is styled as an attorney at law." He took "his clients to attorneys occupying neighboring offices and turned such matters over to said attorneys, with the purpose,

as it clearly appears, that such proceedings in court should be kept alive until the end of the term of his suspension." 32 R. I. at 387. The court said that its purpose was "not to be nullified by an approval of such reasoning. It will not permit its disciplinary orders to be evaded, nor will it allow its officer to publicly disregard its decree by such a subterfuge." 32 R. I. at 388.

*State ex rel Patton, Atty. Gen. v. Marron,* 22 N. M. 632, 167 Pac. 9 (1917), is also in point. In *Marron,* the record presented two questions. The first was whether, after a suspension by the New Mexico Supreme Court, it was contempt for an attorney to hold himself out as an attorney at law by keeping open an office and displaying a window sign on the window of his office describing him as an attorney. It was also concerned with whether using the mails and sending through the mails stationery indicating that the sender was an attorney, or allowing one's name to be published in a telephone directory as an attorney, was contempt. The court determined that it was:

> It must be apparent to any fair-minded person that the holding of himself out as an attorney at law, by means of the keeping open of the same law office, the displaying of the same signs upon the windows and at the entrance thereof, the use of the same stationery and the sending of the same through the mails, the permitting of his name to be published in a telephone and in a city directory, by an attorney, exactly the same as he had done before the order of suspension from practice necessarily brings him into direct antagonism of the order. So far as the public are concerned, the invitation to visit the office and consult the attorney remains unchanged, and the order of the court, if known to them, would be seen of no avail. To the other members of the bar, who necessarily know of the order, his conduct inevitably must be regarded as a reflection upon the dignity and authority of the court making the order. 32 N. M. at 638.

See *In re Phillips,* 64 Mont. 492, 493, 210 Pac. 89 (1922). An original proceeding in contempt against one who had not been admitted to practice in which part of the acts cited were representations "by signs on his office building, and by the designation after his name in the telephone directory as 'attorney.'"

The Colorado Supreme Court, in *People v. Humbert,* 86 Colo. 426, 282 Pac. 263 (1929), found a disbarred attorney who had allowed his name to continue in print in local legal and telephone

directories with the designation "lawyer" or "attorney" in contempt and sentenced him to 30 days in jail. Although there was a statute, governing the activities of disbarred attorneys, the court was doubtful that this added anything to prior law. It was said that "[i]n the absence of statute, it would seem clear that one who falsely represents himself as an officer of this court thereby committed a contempt of the court." 86 Colo. at 427.

There was something of a different twist in *Butterfield,* supra. Instead of leaving his sign alone, or removing it, Butterfield removed some of the letters from the words "law," "office," and "attorney," leaving the words "a Office" and "torn." The court noted that while it did not say that this action was a violation of the suspension order, it indicated the intent and state of mind of the respondent.

The Washington Supreme Court has held that a suspended attorney who failed, *e. g.,* to change his listing in the telephone directory and to advise a prospective client that he was not authorized to practice law, violated the order of suspension. *In re Hawkins,* 81 Wash. 2d 504, 503 P. 2d 95 (1972). Washington had a statute forbidding disbarred or suspended attorneys to hold themselves out as entitled to practice law. It also provided that it (the statute) did not affect the power of the courts to punish as for contempt. The Washington court said that the statute made it clear "that holding oneself out as entitled to practice law constitutes contempt of court of an order of suspension." Id. at 506.

Even more recently, the Florida Supreme Court has held the use of misleading professional cards to be an unauthorized practice of law:

> The unauthorized practice consisted of her distribution and use of business cards bearing these words: "Independent Bar Association of Massachusetts, Lucille E. Moran, Attorney at Law. . . ." The Bar's position is that the card falsely represents and suggests that she is an attorney licensed to practice in this state. We agree. Respondent is resident in Florida; she appears to hold herself out for business here; she advertises that her specialty is tax defense work and that she is an attorney at law. The logical inference is that Florida permits her to practice. *The Florida Bar v. Moran,* 273 So. 2d 390 (Fla. 1973).

### IV. *Is it a Sufficient Defense for Respondent to Claim Lack of*

*Intent or That the Act Done Could Have Been Done Law-
fully by One Who Had Never Been Admitted to the Bar?*

As a general rule, the answer is no. 17 C. J. S., *Contempt,* § 42
(1963), summarizes the rule as follows:

. . . [A]s a general rule a disclaimer or disavowal of a
contumacious intention or design to embarrass the due adminis-
tration of justice is not a valid defense to a charge of contempt,
especially where the facts constituting the contempt are ad-
mitted, or where a contempt is clearly apparent from the cir-
cumstances surrounding the commission of the act. Thus it
it ordinarily is not a valid defense to a charge of contempt that
the intentions of the alleged contemnor are good; or that he
did not intend to violate the decree of order on which the
charge is based, provided the terms of the decree or order are
clear and unambiguous; or that he acted in good faith.

. . . . . . . . . . . . . .
. . . . . . . . . . . .

Notwithstanding a denial of contumacious intention ordi-
narily is not a good defense to a charge of contempt, it will be
considered in mitigation of punishment, or in extenuation of,
or sometimes even as purging, the contempt.

The obvious reason for this rule, is that if it were otherwise,
no one could ever be convicted of, or held in, contempt. One
would always be able to claim a lack of intent or, in the alterna-
tive, good faith, in avoidance of the contempt citation.

Another argument frequently made is that the acts done could
have been done by a non-lawyer without incurring liability for
contempt. This defense has also been unsuccessful. Most cases
recognize that law clerks are employed in tasks which approach
the skill and technical levels one expects from their employers.
It is difficult to say where the line of demarcation lies as to where
the clerk's work begins and where it ends. At the very least, the
relationship should be one in which the clerk's work product
merges with, or becomes, that of the attorney. *Ferris v. Snively,*
172 Wash. 167, 176-178, 19 P. 2d 942 (Wash., 1933).

In *Crawford v. State Bar,* 54 Cal. 2d 659, 355 P. 2d 490, 7 Cal.
Rptr. 746 (1960), the respondent's father, after his disbarment,
remained in the same office he had previously occupied, kept his
same secretary, and continued to practice as a tax consultant.
While his name was no longer used as an attorney and he did

not appear in court, he did confer directly with clients with respect to the preparation of deeds and birth certificates, probate matters, escrows and real estate deals, mining claims, and the dissolution of a partnership. He also referred his tax clients to the petitioner for other legal advice. Petitioner and his father continued to divide the profits of their business equally. The court said:

> Although Howard's services might lawfully have been performed by title companies, insurance companies, brokers, and other laymen, it does not follow that when they are rendered by an attorney, or in his office, they do not involve the practice of law. People call on lawyers for services that might otherwise be obtained from laymen because they expect and are entitled to legal counsel. Attorneys must conform to professional standards in whatever capacity they are acting in a particular matter. . . . It is immaterial that most of the persons dealing with him knew that Howard had been disbarred. 54 Cal. 2d at 667-8.

The court noted that there was California precedent for the argument that a disbarred attorney could do research, write briefs, and draft pleadings without engaging in the practice of law (*In re McKelvey,* 82 Cal. App. 426, 255 Pac. 834), but decided that in the present case the disbarred attorney did not act under the petitioner's supervision. Instead, the disbarred attorney acted independently of the petitioner both in regard to matters involving legal advice and "to matters that can be characterized as such because performed in a law office." 54 Cal. 2d at 668. The court concluded that "individual acts as such, however, are not necessarily determinative. A consideration of the entire pattern of conduct is necessary." 54 Cal. 2nd at 669.

It is also clear that some actions which may be taken with impunity by persons who have never been admitted to the practice of law, will be found in contempt if undertaken by a suspended or disbarred attorney. An early case, involving an attempt to negotiate the release of a prisoner by a disbarred attorney is illustrative. When he failed to succeed, he returned the fee paid him by the prisoner's wife, but he was nevertheless held to be in contempt.

The question is, whether the services undertaken and performed by Duncan constituted the practice of law. It is too

obvious for discussion that the practice of law is not limited to the conduct of cases in courts. [The practice of law is generally defined as embracing] all action taken for [clients] in matters connected with the law. . . .

Under these definitions, there can be no doubt that Duncan engaged in the practice of law. . . . [I]t is expressly alleged in Duncan's return that the contract with Nita Saunders was that the convict, Jim Saunders, when released, should pay him back by labor for "his money and trouble." This can only mean that Duncan contracted to render the service of interviewing the magistrate or other officers having the matter in charge and make such a statement or showing him that the convict would be released on payment of the fine. . . . It does not affect the character of the service that possibly all this might have been done by Nita Saunders, herself. . . . *In re Duncan*, 83 So. C. 186, 189-90, 65 S. E. 210 (1909).

Similarly, *In re Bodkin*, 21 Ill. 2d 458, 173 N. E. 2d 440 (1961), dealt with the situation of a suspended attorney who completed negotiations to settle an insurance claim after his period of suspension had begun. Although Bodkin claimed that he was not practicing law, because the insurance company had admitted liability and his actions were merely those of an adjuster aiding in determining the amount of the settlement, the court found his action to be in contempt:

Representing a claimant in a personal injury suit requires the determination of the questions of liability and damages and is practicing law. Respondent was retained as an attorney and paid attorney's fees. Negotiations extended into the period of suspension and the question of the seriousness of the injury and the amount to be paid in damages was in doubt during this period. The answer alleged that negotiations were not closed until January, 1959, because Miss Kubal did not respond to medical treatment as quickly as had been anticipated. Respondent in testifying as to this matter said Miss Kubal was a "bleeder." It is obvious that settling a case, under these circumstances, required legal skill. It is mere sham of one who has taken the attorney's oath to contend that the acts during suspension were clerical, administrative, and ministerial only. 21 Ill. 2d at 462-3.

The court determined that while there were no previous Illinois cases in which a lawyer under suspension had been further dis-

ciplined because of practicing law while suspended, the situation was one which merited its following the rule that a disbarred attorney, practicing law after disbarment, was in contempt. "Without citation, it would seem to be reasonable and just that a lawyer under suspension may be further disciplined for practicing law during the period of suspension." 21 Ill. 2d at 463.

V. *Is it a Defense to an Allegation of Contempt that a Lower Court Judge Ordered Respondent to Take an Action Placing Him in Contempt?*

Although no recent cases have been found, it would appear that the order of a district court judge cannot supersede the order of the state supreme court. However, in the instant case the testimony of the Honorable E. Newton Vickers, Senior Judge, District Court, Shawnee County, Kansas, concerning his request to Respondent in the *Smith* case has been considered in mitigation. In *Danford v. Superior Court*, 49 Cal. App. 303, 193 Pac. 272 (1920), a lower court had disbarred the attorney and sought to reinstate him. However, the lower court did not have the authority to do so, and the attorney was found to be in contempt. A case which is perhaps closer on point is *In re White*, 54 Mont. 476, 171 Pac. 759 (1918). In *White*, the attorney general asked for a contempt citation because the respondent had been appearing in the state's lower courts without having been admitted to practice by the supreme court. The respondent pleaded, in avoidance, that he had obtained permission of the presiding judge prior to appearing in the district court cases.

> The respondent assumes that permission granted him by Judge Thompson to practice until he should be regularly admitted by order of this court ought to absolve him entirely from the charge of contempt, and hence that he should not be subject to punishment. . . . While, therefore, the error into which Judge Thompson fell in granting respondent temporary permission to practice may be taken in palliation of the offense, it cannot be alleged as an excuse. *It was respondent's duty to ascertain what his rights were;* especially so as he was assuming to act as an officer of the law and thus to possess the qualifications necessary to protect and enforce rights of such persons as would entrust him with them. 54 Mont. 478-9. (Emphasis supplied.)

As seems to be the general rule in these cases, the referee found

indications of the fact that respondent held himself out to the public as capable of practicing law, *e. g.*, "on letterheads used by him in his correspondence and by a sign displayed in front of his office. . . ." 54 Mont. 477.

## CONCLUSION

Respondent's counsel seemingly admits that the preparation of the brief for Judge Vickers and the signing of the Journal Entry in *Smith v. Harrison* are the practice of law. While the fact that Respondent was requested to prepare the brief and submit it should be taken in mitigation of the penalty with reference to this aspect of the contempt, it was the duty of the Respondent to ascertain his rights and comply with the order of the Supreme Court. In any event, nearly two months transpired after submission of the brief and Respondent had adequate time at that point to withdraw and allow other counsel to enter the case. Judge Vickers' testimony further indicates that while he expected compliance with his order to submit a brief, he did not feel that he had also ordered Respondent to approve the Journal Entry. The preparation of legal instruments by which legal rights are secured is clearly the practice of law.

It is undisputed that Respondent's office remained open and that he did nothing to obscure the sign which identified it as a law office and him as qualified to practice law. One who holds himself out to the public as capable of practicing law, when he is not, is in contempt of the supreme court regardless of whether he has ever been admitted to the bar. Certainly one who has been suspended from practice must take at least the same measures as one who has not been admitted in avoiding the appearance of disobedience of the court's order.

It is further undisputed that legal business was transmitted and prepared on letterhead stationery identifying Respondent as an attorney and giving the impression to the public that he was capable of transacting legal business. This behavior would be contempt whether he had been suspended, disbarred, or never admitted to practice.

Discussions involving the legal rights of parties involved in litigation (*Lewis, Smith,* and *Lemert*) are clearly the practice of law and the fact that the same discussions might have been undertaken by laymen does not purge the contempt.

The law seems clear. Respondent's conduct constituted the practice of law in contempt of this court's order. The proper disposition of the case presents more difficulty. The applicable statute is K. S. A. 1973 Supp. 7-111:

"An attorney-at-law may be disbarred or disciplined by the supreme court, for any of the following causes arising after his admission to practice in this state: 1. For willful disobedience of an order of court requiring him to do or forbear an act connected with or in the course of his profession."

There is thus clear statutory authority for imposing discipline for violation of our order of suspension.

Discipline, including permanent suspension or disbarment, may be imposed for contempt of court. *In re Hanson.*, 134 Kan. 165, 5 P. 2d 1088; *In re Hanson.*, 99 Kan. 23, 160 Pac. 1411. Continued practice during suspension has been considered grounds for disbarment. *State ex rel. Nebraska State Bar Assn. v. Butterfield,* 172 Neb. 645, 111 N. W. 2d 543; *Matter of Dangler,* 205 App. Div. 94, 199 N. Y. S. 306; *In re Hosford,* 62 S. D. 374, 252 N. W. 843 (1934). In the *Butterfield* and *Hosford* cases the court was influenced in its final disposition, in part, by the attorney's conduct leading to the original suspension.

In *Hosford,* the respondent attorney urged that the court should confine its consideration to the present record, without regard to the matters contained in the original proceeding. The court rejected that suggestion, noting that it was required to exercise continuing jurisdiction over the conduct of all attorneys. In assessing the present fitness of an attorney to practice law "and to properly discharge its admitted function, both as to the individual charged and to the public, the court should have all of the reliable information available to it through legitimate channels, and should carefully consider all of such information in conjunction with all of the cricumstances of the situation." (Id., 62 S. D. at 385, 252 N. W. at 848.) The court went on to say:

"It obviously follows that an act by a suspended or disciplined attorney, not of itself deemed sufficient to invoke the disbarment power, might give rise to modification of the judgment drastically, on complaint or on the court's own motion. Likewise the conduct of accused or the development of additional facts might give rise to modification of a suspension order, either favorably or unfavorably to accused." (Id., 62 S. D. at 385, 252 N. W. at 848.)

The same concept of continuing jurisdiction is reflected in our Rule No. 208 (205 Kan. lxiv) authorizing a disbarred or suspended attorney to apply for reinstatement or for a modification of the order suspending him. An action for contempt of court based on a violation of an injunction (which, in essence, is what our order of suspension was) is "not a separate independent action but is a part of the original injunction suit." (*State, ex rel., v. Bissing,* 210 Kan. 389, 502 P. 2d 630, Syl. ¶ 4. See also, *Frey v. Willey,* 161 Kan. 196, 166 P. 2d 659, Syl. ¶ 2.) We therefore have no hesitancy in considering the record in the original disciplinary proceeding to determine the sanctions to be imposed here.

In this case the conduct leading to respondent's suspension is chronicled in *State v. Schumacher,* supra, and need not be repeated here. The violations of the Code of Professional Responsibility were several and serious. This court imposed the limited suspension recommended by the board of law examiners with expressed reluctance, finding, "although more severe discipline might be justified, the recommendations of the State Board of Law Examiners should be accepted." (210 Kan. at 382.)

It was hoped that the discipline originally imposed would have a salutary, prophylactic effect. It apparently did not. The record now before the court discloses a conscious and deliberate plan to evade the fair import of this court's order of suspension. Respondent's first step after his suspension was to attempt to secure a six months' continuance in all of his pending cases. The obvious purpose was to retain the cases, the clients, and the fees. When this ploy was unsuccessful he entered into the arrangement with Grant, who obviously became what is colloquially termed a "front man." The only act respondent refrained from doing as a lawyer was making a formal appearance in court; *i. e.,* he stayed behind the rail; in all other respects he continued to function just as he had before the suspension.

Respondent asserts that he believed in good faith that maintaining an office where he was held out to be an attorney, using a letterhead describing himself as an attorney, counseling clients as to legal matters, negotiating with opposing counsel about pending litigation, and fixing and collecting fees for services rendered by his associate, did not constitute the practice of law. If so, in the opinion of the court such a belief demonstrates as much as anything his present unfitness to practice law.

Our commissioner recommended an additional suspension of six

months; our experience in this case leads us to conclude that such an order would be inadequate. It is the opinion of the court that as a result of the conduct of respondent during his suspension, in blatant disregard of this court's order, together with his earlier conduct demonstrating a total lack of comprehension of the standards of conduct expected of an attorney, he should be suspended indefinitely.

In view of the financial hardship upon respondent and his family which will unfortunately but unavoidably accompany this result, costs in this proceeding will not be assessed against him.

It is so ordered.

OWSLEY, J., not participating.