No. 96,578

In the Matter of CHRISTOPHER ROGER PAUL MILLER, *Respondent.*

147 P.3d 150

Opinion filed December 8, 2006.

*Alexander M. Walczak*, deputy disciplinary administrator, argued the cause and was on the formal complaint for petitioner.

*Nancy A. Roe*, of Kansas City, argued the cause and was on the brief for respondent, and *Christopher Roger Paul Miller*, respondent, argued the cause pro se.

*Per Curiam:* This is an original uncontested proceeding in discipline filed by the office of the Disciplinary Administrator against respondent, Christopher Roger Paul Miller, of Lawrence, an attorney admitted to the practice of law in Kansas in 1984.

A panel of the Kansas Board for Discipline of Attorneys held the hearing on the formal complaint on January 17, 2006. A few days prior to the hearing, respondent filed an amended answer to the complaint wherein he admitted most of the allegations in the complaint and that he had violated KRPC 1.5(a) (2005 Kan. Ct. R. Annot. 397) (unreasonable fees); KRPC 3.1 (2005 Kan. Ct. R. Annot. 455) (meritorious claims and contentions); and KRPC 8.4(c) (2005 Kan. Ct. R. Annot. 504) (misrepresentation). At the hearing, the Disciplinary Administrator had 55 exhibits admitted but called no witnesses and waived an opening statement, relying on respondent's admissions in his amended answer (referred to as "stipulations" in the final hearing report).

## FINDING OF FACT

The panel's findings of fact are summarized as follows:

After graduating from law school, respondent worked as a staff attorney for the Kansas Insurance Department for just over 2 years. During that time, he was responsible for supervising the Kansas Workers Compensation Fund (Fund) and the attorneys who represented the Fund across the state. In January 1986, respondent

left the Kansas Insurance Department and entered the private practice of law in Lawrence, Kansas. Respondent then entered into an agreement with the Kansas Insurance Department to represent the State of Kansas in connection with claims filed against the Fund. This agreement was not detailed in a written contract; however, there were written policies, guidelines, and agreements that related to billing.

The Kansas Insurance Department assigned cases to respondent on a case-by-case basis. With each case assigned to respondent, the supervising attorney for the Kansas Insurance Department would send respondent an engagement letter specifying:

"Legal fees are based on $60 per hour for services rendered in representation of the Fund. Any legal fee accumulating to the excess of $1,500 must have express written approval from this office. Fees in excess of $2,500 will only be allowed in unusual circumstances. The Accounts and Reports Division requires that bills for legal services must give date, type of service rendered, the general description of the service, the hourly rate being billed upon and the amount of time required for each occasion."

In addition to the engagement letters, on May 19, 1989, the Kansas Insurance Department issued a policy statement regarding attorney fees paid to attorneys representing the Fund, which included some of the same language that had appeared in the engagement letters and provided the following additional provisions regarding billable items:

"Billable Items: The legal fee rate quoted above [$60 per hour] is expected to include all overhead and internal charges associated with your practice. Unless otherwise agreed upon in advance and in writing, the Fund will not pay for overhead or normal firm operating costs outside the legal fee rate such as:
"1. Administrative or clerical services, including secretarial, docket, word processing, accounting, library or other clerical staff time.
"2. Time charges for preparation of bills.
"3. Time charges for travel to and attendance at Fund seminars."

In 1994, Kathleen Sebelius ran against the incumbent, Ron Todd, for the Kansas Insurance Commissioner in the general election. Respondent served as the campaign manager and spokesperson for Todd's re-election campaign. Sebelius won the race and took office in January 1995. In May 1995, respondent was informed

he would no longer be receiving cases from the Kansas Insurance Department. After respondent learned he would no longer be receiving cases from the Kansas Insurance Department, he forwarded a final bill, in five parts, to the Kansas Insurance Department for $375,900 in unpaid attorney fees and expenses. The Kansas Insurance Department declined to pay respondent's bill.

On September 6, 1996, after not receiving payment on his bill, respondent and his wholly owned law firm, Little & Miller, Chtd., filed a lawsuit in the District Court of Douglas County, Kansas, seeking payment for his billed but unpaid legal services and for loss of future earnings. (*Little & Miller, Chtd. v. Kathleen Sebelius, et al.*, 96 C 343.) In this lawsuit, respondent claimed that the Fund and Sebelius had breached a contract when they failed to pay the respondent's bill for services performed. Respondent further alleged the Fund and Sebelius, in both "oral and written communications with the [respondent], confirmed [their] intention[s] and the parties' agreement [that respondent] would continue representing the . . . Fund . . . , as long as the [respondent] properly and adequately represented the interests of the Fund." Respondent claimed the Fund and Sebelius had breached the contract, without just cause, by demanding respondent discontinue his representation of the Fund and return all files belonging to cases previously assigned to him by the Fund. Respondent further alleged that in breaching this contract, the Fund and Sebelius had caused the respondent a loss of future earnings in the amount of $375,900. Respondent later, in his amended answer filed herein, admitted that his claims for loss of future earnings were frivolous and in violation of KRPC 3.1.

Respondent also included allegations in his lawsuit that the Fund and Sebelius had committed the tort of retaliatory discharge of respondent; violated respondent's right to free speech and association; defamed the respondent; and committed the tort of intentional infliction of emotional distress.

In response, the named defendants filed a counterclaim against respondent alleging that he had been overpaid $426,000.00. The lawsuit was transferred to the Shawnee County District Court on a motion for change of venue. In a series of decisions by the Shaw-

nee County District Court, all of respondent's claims were dismissed except for his allegations that the Fund and Sebelius had breached a contract by not paying him for services performed. (*Little and Miller, Chartered v. Sebelius*, 97 CV 48.) In November 2002, respondent's remaining claim of breach of contract and the defendants' counterclaim were resolved by mutual dismissal.

Despite the Fund's policies regarding billing, the respondent billed the Fund for time spent performing clerical services, including filing, calendaring, travel to the post office, and typing. In his amended answer, respondent admitted that such billings were in violation of the standard engagement letter and amounted to unreasonable fees, contrary to KRPC 1.5.

Further, despite the clear policy of the Kansas Insurance Department to the contrary, respondent billed the Fund for preparation of the bills. Again, in his amended answer, respondent admitted that he billed the Fund for the preparation of bills and that those billings were unreasonable fees in violation of KRPC 1.5.

Additionally, respondent routinely billed the Fund for overhead expenses by disguising the expenses as something that appeared to be compensable. For example, on many occasions when the time slip stated that a secretary spent time typing, respondent misrepresented the activity and billed the Fund for "preparation of documents" or "review of file" by a paralegal. Respondent admitted, in his amended answer, that he billed for overhead expenses, disguised as items that are compensable. He further admitted that practice amounted to unreasonable fees and a misrepresentation contrary to KRPC 1.5 and KRPC 8.4(c).

Finally, in respondent's final billings, which were sent to the Fund after respondent knew he would no longer be receiving cases from the Kansas Insurance Department, respondent submitted duplicate bills. Specifically, respondent twice submitted bills for work valued at $44,000. In his amended answer, respondent admitted that billing the Fund for the same work twice constitutes unreasonable fees and a misrepresentation in violation of KRPC 1.5 and KRPC 8.4(c).

## CONCLUSIONS OF LAW

The hearing panel then made the following conclusions of law:

"1. Based upon the findings of fact, based upon the Respondent's stipulations, the Hearing Panel concludes as a matter of law that the Respondent violated KRPC 1.5(a), KRPC 3.1, and KRPC 8.4(c), as detailed below.

"2. 'A lawyer's fee shall be reasonable.' KRPC 1.5(a). The Respondent stipulated that he charged the Kansas Insurance Department unreasonable fees. Specifically, the Respondent stipulated that (1) billing for filing, calendaring, traveling to the post office, and typing was an unreasonable fee, (2) billing for the preparation of bills was unreasonable, (3) billing for overhead expenses, disguised as compensable items amounted to unreasonable fees, and (4) billing for the same work twice was an unreasonable fee. Based upon the Respondent's stipulation, the Hearing Panel concludes that the Respondent's fees were unreasonable, in violation of KRPC 1.5(a).

"3. 'A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous.' KRPC 3.1. Counts III and IV of the Respondent's Petition [the allegations of loss of future earnings] were not authorized by existing Kansas law. Additionally, Counts III and IV were not a reasonable extension of recognized Kansas law. Accordingly, on March 12, 1997, the Court concluded that the Respondent failed to state a claim upon which relief can be granted in Counts III and IV of his Petition. Furthermore, the Respondent stipulated that Counts III and IV were frivolous and by filing the Petition that included Counts III and IV, the Respondent violated KRPC 3.1. Because the Respondent stipulated that his claims in Counts III and IV of his Petition were frivolous and in violation of KRPC 3.1, the Hearing Panel concludes that the Respondent violated KRPC 3.1.

"4. 'It is professional misconduct for a lawyer to . . . engage in conduct involving . . . misrepresentation.' KRPC 8.4(c). The Respondent stipulated that he engaged in conduct that involved misrepresentations (1) when he disguised overhead expenses as compensable items and (2) when he billed the Fund twice for the same work. As such, the Hearing Panel concludes that the Respondent violated KRPC 8.4(c)."

## RECOMMENDED DISCIPLINE

In recommending the discipline to be imposed, the panel stated:

"In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"*Duty Violated.* The Respondent violated his duty to his client.

"*Mental State.* The Respondent knowingly violated his duty.

"*Injury.* As a result of the Respondent's misconduct, the Respondent caused actual injury.

"*Aggravating or Mitigating Factors*. Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factors present:

"Dishonest or Selfish Motive. The Respondent's misconduct was motivated by selfishness. He disguised non-compensable expenses as compensable, he double-billed the Fund, and he billed for items that were not authorized pursuant to the Fund's policy. The Respondent's misconduct was motivated by selfishness.

"A Pattern of Misconduct. The Respondent engaged in a pattern and practice of improperly billing the Fund for attorney fees and expenses that spanned nine years. Accordingly, the Hearing Panel concludes that the Respondent engaged in a pattern of misconduct.

"Multiple Offenses. The Respondent violated KRPC 1.5(a), KRPC 3.1, and KRPC 8.4(c). As such, the Respondent committed multiple offenses.

"Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following mitigating circumstances present:

"Absence of a Prior Disciplinary Record. The Respondent has not previously been disciplined.

"The Present and Past Attitude of the Attorney as Shown by the Respondent's Cooperation During the Hearing and the Respondent's Acknowledgment of the Transgressions. The Respondent fully cooperated in the disciplinary process as exhibited by his stipulation to the vast majority of the allegations in the Formal Complaint.

"Inexperience in the Practice of Law. The Kansas Supreme Court admitted the Respondent to practice law in 1984. At the time the Respondent's misconduct began, the Respondent had been practicing law for only two years. As such, the Hearing Panel concludes that the Respondent was inexperienced in the practice of law.

"Previous Good Character and Reputation in the Community Including any Letters from Clients, Friends, and Lawyers in Support of the Character and General Reputation of the Attorney. The Respondent is an active and productive member of the bar in Lawrence, Kansas. He enjoys the respect of his peers and clients and generally possesses a good character and reputation.

"Delay in Disciplinary Proceedings. The acts which constitute violations of the Kansas Rules of Professional Conduct last occurred in 1995. A complaint was filed at that time by Bruce Miller, Disciplinary Administrator. Because of the lawsuit between the Respondent and the state of Kansas, proceedings before the Kansas Board for Discipline of Attorneys were held in abeyance until the conclusion of the lawsuit. On December 20, 2002, following the conclusion of the civil suit, Richard F. Hayse, Paula Greathouse, and Susan R. Schrag filed a second complaint regarding this matter against the Respondent. The misconduct in this case began in 1986 and ended in 1995. Thus, prior to the hearing held on the Formal

Complaint in this matter, it had been 20 years since the misconduct began and 11 years since the misconduct ended. The delay in the proceedings is a significant mitigating factor in this case. It is significant because in the meantime, during the past 11 years, it appears that the Respondent has not repeated the misconduct. Additionally, it appears that the Respondent has not engaged in any other types of misconduct during the past 11 years. To impose harsh discipline on the Respondent at this remote date would, in the Hearing Panel's opinion, constitute retributive punishment as opposed to discipline and would not appear to provide any needed safeguards for the public to prevent similar conduct in the future. Because of the lapse of time between the occurrence of the violations and the disciplinary hearing, the Hearing Panel does not believe that harsh discipline should be imposed against the Respondent.

"Remorse. At the hearing on the Formal Complaint, the Respondent expressed genuine remorse."

The panel then recommended that respondent be suspended from the practice of law for 2 years, but that the imposition of that suspension be suspended and that the respondent be placed on probation for a period of 2 years subject to the terms and considerations of respondent's proposed probation plan.

The panel's presiding officer, Philip D. Ridenour, filed a concurring opinion. The concurring opinion is highly critical of respondent's conduct and is reproduced, in part, as follows:

"The evidence showed that as the attorney supervising attorneys hired by the Fund, the Respondent was familiar with every aspect of lawyer billing. He received and reviewed bills from lawyers working for the Fund and he was familiar with the review process utilized by the Fund in reviewing bills. When he left the Fund to go into private practice, the Respondent trained his successor, ensuring that the bill review process would continue to be conducted in the same manner.

"The Disciplinary Administrator offered 55 exhibits, the admission of which was stipulated to by the Respondent. The exhibits show the billing procedures utilized by the Respondent. Time slips were maintained, not only by the attorneys but also by clerical staff. The deposition of Timothy Miller and the testimony of the Respondent indicated that there are thousands of these billings slips retained in the Respondent's files.

. . . .

". . . The intentional generation of thousands of individual time slips suggests to the me a Clintonesque intent to obfuscate the truth of the Respondent's charge[d] billings and to make it difficult if not impossible to determine what legal services were performed for the hours charged.

"From the evidence presented to the Hearing Panel, it appears that the Respondent intentionally designed his billing practices to take advantage of his

knowledge of the bill review practices of the Fund. . . . The generation of thousands and thousands of time slips and the vague, virtually meaningless descriptions of the work performed made it virtually impossible for the Respondent's bills to be audited, thereby ensuring the continued success of his dubious billing practices.

. . . .

"In my judgment, the Respondent's billing system was based on astonishing greed. The Respondent's action in filing the lawsuit after his discharge reflects a lack of judgment and a lack of maturity. Had the misconduct occurred recently, the only appropriate discipline, in my opinion, would be disbarment."

Mr. Ridenour then concurs in the panel's recommended discipline based on the length of time that has expired since the misconduct occurred and the absence of new disciplinary complaints.

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by substantial, clear, convincing, and satisfactory evidence. *In re Landrith*, 280 Kan. 619, 636, 124 P.3d 467 (2005); see also Supreme Court Rule 211(f) (2005 Kan. Ct. R. Annot. 287) (misconduct to be established by clear and convincing evidence).

The respondent did not file any exceptions to the panel's final report. A hearing panel's final report is deemed admitted under Supreme Court Rule 212(c) and (d) (2005 Kan. Ct. R. Annot. 297) when a respondent fails to file exceptions. *In re Devkota*, 280 Kan. 650, 655, 123 P.3d 1289 (2005).

We conclude the panel's findings of fact are supported by clear and convincing evidence and support the panel's conclusions of law. Further, we adopt the panel's findings of fact and conclusions of law.

With respect to the discipline to be imposed, the panel's recommendation is for respondent to be suspended from the practice of law for 2 years, but for the imposition of that suspension be suspended and the respondent be placed on probation for a period of 2 years, subject to the terms and conditions of respondent's

proposed probation plan, and is advisory only. The recommendation of the panel shall not prevent the court from imposing discipline greater or lesser than that recommended by the panel or the Disciplinary Administrator. Supreme Court Rule 212(f).

Respondent was hired as a law clerk by the Kansas Insurance Department in December of 1983. Upon or shortly after being sworn in as an attorney in April 1984, he was assigned the duty to supervise the administration of the Kansas Workers Compensation Fund. The Fund was the successor to the Second Injury Fund. The history, development, and purpose of the Fund were stated in Woodin, *Workmen's Compensation— The Workmen's Compensation Fund*, 24 Kan. L. Rev. 641 (1976), as follows:

"A significant number of persons in the Kansas labor market suffer from some impairment that renders them more vulnerable to disabling industrial injuries covered by the Workmen's Compensation Act. Employers are naturally reluctant to employ such high-risk workmen. The increase in unemployment and welfare rolls in general, and the return of disabled World War II veterans to Kansas society in particular, led to the passage of legislation in 1945 creating the Second Injury Fund. Availability of Second Injury Fund relief was narrow, and this early statute did little to overcome employer prejudice against handicapped job applicants. Few claims were made against the Fund, and there was little litigation.

"The basic social problem continued to mount, and in 1961, the legislature greatly broadened the coverage of the Second Injury Fund. The purpose of the expanded Second Injury Fund (and its predecessor) was to encourage the employment of persons handicapped as a result of specified impairments by relieving employers, wholly or partially, of workmen's compensation liability resulting from later industrial accidents. For the next few years, employers continued to be reluctant to seek relief from the Fund, but by 1966, many employers, through their insurance carriers and attorneys, had developed techniques to satisfy their burden of proof, and the Fund for the first time had a significant influence in the intended direction. Some larger employers actively incorporated the Second Injury Fund provisions into their programs for hiring the handicapped."

As set forth in K.S.A. 44-566a, the Fund is financed by annual assessments against all insurance carriers, self-insurers, and group-funded workers compensation pools insuring the payment of compensation under the Workers Compensation Act. Thus, those actually paying assessments, which include costs for unearned and excessive attorney fees, are far removed from any meaningful opportunity to audit or challenge any attorney fee billings.

As the Fund's attorney in charge of supervising attorneys hired to represent the Fund, respondent was intimately familiar with all aspects of the billing and auditing procedures. As noted in the concurring panel opinion, respondent trained his successor to follow the same procedures.

After leaving the Insurance Department, respondent took on representation of the Fund on an assigned case-by-case basis. He clearly used his extensive inside knowledge of the Fund's handling of attorney fee billing to develop and implement a plan for the systematic fleecing of the Fund for unearned and unreasonable attorney fees. Negligence and inadvertence were not involved—these were intentional acts devised to unjustly enrich respondent and so disguised as to avoid detection. The district court found in respondent's lawsuit that respondent engaged in "flagrantly abusive billings." As the Ridenour concurring opinion points out, the flooding of the Fund with thousands of time slips containing virtually meaningless descriptions of the work performed made meaningful audit thereof impossible. The Ridenour concurrence states disbarment would be the "only appropriate discipline" but for the long time lag between the offending conduct and the imposition of discipline.

What was the primary cause of the long delay? The original complaint was put on hold during the pendency of the lawsuit filed by respondent seeking damages for loss of future earnings, retaliatory discharge, and other claims. In his amended answer, respondent admitted that some of the claims therein were frivolous, and this lawsuit is the basis for the admitted KRPC 3.1 violation.

Should the respondent's filing of this lawsuit with its resultant delay in the processing of the disciplinary complaint enable respondent to escape appropriate discipline for his flagrant and intentional professional wrongdoing? The answer is clearly no. The panel made reference to the fact no new disciplinary complaints have been filed in the intervening years. The opportunity for respondent to use his superior knowledge to fleece the Fund stopped upon his termination of representation and the discovery of his wrongdoing.

Some of the delay must be charged to the Disciplinary Administrator as noted in the final hearing report. The first complaint filed in 1995 was held in abeyance during the pendency of the respondent's lawsuit. The legal action was dismissed in November 2002. A second complaint was filed on December 20, 2002. The formal complaint arising therefrom was not filed until October 27, 2005. Why this matter languished in the Disciplinary Administrator's office for almost 3 years after the dismissal of the lawsuit and the filing of the second complaint is not explained.

The final hearing report devotes considerable space to the probation plan submitted by respondent. The panel found the plan to be timely submitted and acceptable in all respects. As we do not believe probation in any form is appropriate discipline for the egregious conduct herein, we see no reason to set forth the particulars of the probation plan.

After careful consideration, we conclude that a 2-year suspension from the practice of law is the appropriate discipline, although the imposition of a more severe discipline could be justified.

IT IS THEREFORE ORDERED that Christopher Roger Paul Miller be suspended from the practice of law in the state of Kansas for a period of 2 years, effective the date of this opinion, in accordance with Supreme Court Rule 203(a)(2) (2005 Kan. Ct. R. Annot. 247).

IT IS FURTHER ORDERED that respondent forthwith comply with Supreme Court Rule 218 (2005 Kan. Ct. R. Annot. 315), that the costs of these proceedings be assessed to the respondent, and that this opinion be published in the official Kansas Reports.