No. 103,492

In the Matter of CHRISTOPHER R. MILLER, *Respondent.*

(238 P.3d 227)

Opinion filed August 13, 2010.

*Alexander M. Walczak,* deputy disciplinary administrator, argued the cause, and *Stanton A. Hazlett,* Disciplinary Administrator, was with him on the brief for the petitioner.

*John J. Ambrosio,* of Ambrosio & Ambrosio, Chtd., Topeka, argued the cause and was on the brief for respondent, and *Christopher R. Miller,* respondent, argued the cause pro se.

*Per Curiam:* This is a contested original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Christopher R. Miller. The overarching question presented is whether Miller engaged in the unauthorized practice of law after the Supreme Court imposed a 2-year suspension of his license to practice law on December 8, 2006.

### FACTUAL AND PROCEDURAL OVERVIEW

Miller was admitted to the practice of law in the state of Kansas on April 19, 1984. In 1991, he and another attorney formed a professional association, styled Little and Miller, Chartered. After the other attorney left the firm, Miller continued to practice law from the same location under the same corporate name. The Supreme Court suspended Miller's license to practice law for 2 years beginning December 8, 2006, for misconduct related to improper billing. *In re Miller,* 282 Kan. 689, 699, 147 P.3d 150 (2006). Miller then entered into a verbal arrangement with Chris Cowger, an attorney and long-time friend, to handle the legal practice of the professional association. Under the arrangement, Cowger was paid by the corporation on an hourly basis and his compensation was reported to the Internal Revenue Service as being that of an independent contractor.

During the suspension period, on January 17, 2007, a letter on firm stationery that identified Miller as an attorney of the firm was sent to opposing counsel in a case that had begun before Miller's

suspension. Miller's name was typed in the signature portion of the letter, and the body of the letter declared: "As you will recall, I represent [the pre-suspension client]." The attorney to whom the letter was sent filed a report with the Disciplinary Administrator's office.

The Disciplinary Administrator's office appointed an attorney to investigate the report. The investigator requested the file on the case addressed in the letter, but Miller never provided the file. The Disciplinary Administrator filed a formal complaint against Miller on March 11, 2009. Miller answered the complaint, challenging most of the allegations relating to the arrangement with Cowger. After an evidentiary hearing on June 23, 2009, at which the respondent was personally present and was represented by counsel, the appointed hearing panel found that Miller had violated Kansas Rules of Professional Conduct (KRPC) 5.5 (2009 Kan. Ct. R. Annot. 580) (unauthorized practice of law), KRPC 8.1(b) (2009 Kan. Ct. R. Annot. 594) (failure to respond to lawful demand for information from disciplinary authority), KRPC 8.4(a) (2009 Kan. Ct. R. Annot. 602) (misconduct), and 8.4(g) (engaging in conduct adversely reflecting on lawyer's fitness to practice law). The panel recommended that Miller be disbarred.

### HEARING PANEL FINAL REPORT

The hearing panel made the following findings of fact, conclusions of law, and dispositional recommendation:

#### "FINDINGS OF FACT

. . . .

"2.  The Respondent practiced law in Lawrence, Kansas. Beginning in approximately 1991, the Respondent became associated in the practice of law with Jerry Little. The Respondent and Mr. Little established their law firm as a corporation, Little and Miller, Chartered.

"3.  In approximately 1995, Mr. Little left the law firm. After Mr. Little left the firm, the Respondent continued to practice law from the same location and own and operate the corporation.

"4.  On December 8, 2006, the Kansas Supreme Court suspended the Respondent's license to practice law for a period of two years. *In re Miller*, 282 Kan. 689 (2006). In that case, the Court concluded that the Respondent violated KRPC 1.5(a), KRPC 3.1, and KRPC 8.4(c). In its opinion, the Court ordered the Respondent to comply with Kan. Sup. Ct. R. 218. [Footnote: In the letter the Re-

spondent sent to his clients in an attempt to comply with Kan. Sup. Ct. R. 218, he failed to mention the fact that he was suspended from the practice of law.]

"5. At the time the Respondent was suspended from the practice of law, the Respondent operated a high volume workers' compensation law practice. He had approximately 145 open files at the time of his suspension.

"6. Shortly before his suspension, the Respondent contacted Christopher Cowger and requested that Mr. Cowger take over the Respondent's law practice in the event he was suspended from the practice of law. Rather than transfer the files to Mr. Cowger, the Respondent and Mr. Cowger agreed that Mr. Cowger would come to Lawrence and work out of the Respondent's office.

"7. The Respondent and Mr. Cowger agreed that the corporation would pay Mr. Cowger $70 per hour. Mr. Cowger was not paid as an employee or as an owner of the corporation, but rather, Mr. Cowger was paid as an independent contractor. For tax purposes, Mr. Cowger received a Form 1099 to report his income from the corporation.

"8. Mr. Cowger worked in this capacity from sometime after December 8, 2006, until some date in December, 2007.

"9. The agreement between Mr. Cowger and the Respondent was not reduced to writing.

"10. Prior to his suspension, the Respondent represented Dr. John Skuban in a worker's compensation case against Lab One, Inc. John R. Emerson represented Lab One. At some point, the Respondent or his assistant prepared a letter on behalf of Dr. Skuban addressed to Mr. Emerson. It appears that someone from the Respondent's office provided a copy of the letter to Dr. Skuban who took the letter to Walgreens.

"11. The letter provided, in pertinent part, as follows:

'As you will recall, I represent Dr. Skuban. I am writing with regard to his medical treatment; and more specifically, his prescription medication, prescribed by his "authorized" treating doctor, under the previous Order of the Court.'

The letterhead read:

'Law Office
645 Country Club Terrace
P.O. Box 1265
Lawrence, Kansas 66044
Telephone: 785-841-6245
Fax: 785-841-6445
e-mail: millerlaw@juno.com'

The unsigned signature block read, 'Sincerely yours, Chris Miller For the Firm.'

"12. Mr. Emerson received Disciplinary Administrator's Exhibit 2 *via* facsimile from Walgreens Companies. Later, Mr. Emerson discovered a second copy of the same letter, signed "Chris" in his file.

"13. Then, on January 19, 2007, Mr. Cowger wrote to Mr. Emerson. The letter began similarly but contained different information.

"14. At the hearing on this matter, the Respondent testified that he did not sign Disciplinary Administrator's Exhibit 3. He explained that when he signs letters, he typically signs 'Chris Miller' rather than 'Chris.' Mr. Cowger testified that he believes that he signed Disciplinary Administrator's Exhibit 3. Mr. Cowger explained that when he signs letters, he typically signs only 'Chris.'

"15. The Respondent and Mr. Cowger testified that the letters found at Disciplinary Administrator's Exhibit 2 and 3 were inadvertently sent out. They testified that they attempted to change the letterhead to ensure that no letters with Mr. Miller's name were sent out. They testified that this letter was simply a mistake.

"16. At the hearing on this matter, the Respondent and Mr. Cowger also testified about the structure of the law firm. The Respondent's testimony was at odds with Mr. Cowger's testimony regarding the management and ownership of the firm. The Respondent testified that he gave the corporation to Mr. Cowger:

'Q. [By Mr. Walczak] Now, did you go and change the Articles of Incorporation with the Secretary of State in late December of 2007 or January 2008?

'A. [By the Respondent] They were changed, I'm not sure exactly when.

'Q. Well, they were changed much later, correct?

'A. I don't know without looking at the filing.

. . . .

'Q. Okay. So whether it be back in—when Mr. Cowger began working with Little and Miller did you hold meetings of the shareholders?

'A. He was the only shareholder.

'Q. He was a shareholder?

'A. He was—he owned the corporation.

Q. He was given—how was he given that?

'A. I essentially gave it to him. I said it's yours.'

However, while Mr. Cowger recalled signing some documents that the Respondent put in front of him, he had no recollection of owning the corporation or being a shareholder.

'Q. [By Mr. Walczak] Are you familiar with an entity of Miller and Little—or Little and Miller, Chartered?

'A. [By Mr. Cowger] Yeah. I mean, I'm familiar with that name, yes.

'Q. What was it or what is it?

'A. Well, it was—I guess it was an entity that Mr. Miller formed with respect to his law practice.

'Q. Okay. And were you going to be—did you have any ownership in that?

'A. No, I did not.

'Q. Do you know whether or not what type of corporate entity it was, was it like a limited liability company or was it a corporate or what?

'A. I believe it was a corporation, but I really didn't have any involvement with the corporation per se or at all.

'Q. Were you a shareholder?

'A. No.

'Q. Were you an officer?
'A. I don't believe I was.
'Q. Did you ever attend any type of corporate meetings or discussions with Mr. Miller regarding the operation of the corporation?
'A. Not that I recall, no.
. . . .
'Q. Now, there is—there's been some corporate documents admitted in evidence that listed you as the president, as well as the treasurer. Are you aware of those?
'A. Yeah, I think I signed some documents to that effect.
'Q. You signed some documents?
'A. I may have, yes.
'Q. Okay. Did you authorize that to be done?
'A. Well, I signed it, so—
'Q. If you signed it, what was the purpose of that?
'A. Well, I'm not sure to be perfectly honest about it. They were presented to me for signature. It was some corporate matter which to me I was—all I really cared about was getting paid the $70 an hour. You know, what went on beyond that as far as the corporate really didn't have any impact or bearing on me. I didn't feel like it anyway.'

"17.   On April 12, 2007, the Respondent prepared the Annual Statement for Little & Miller, Chartered. According to that document, Mr. Cowger was the President, the Treasurer, and the sole shareholder of the corporation. Additionally, the Respondent was the Secretary.

"18.   Despite that Mr. Cowger was listed as the President and Treasurer of Little & Miller, Chartered, Mr. Cowger had no authority over the financial operations of the corporation. Mr. Cowger did not have access to or control of the checking accounts of the law practice. Mr. Cowger did not sign any checks, rather, the Respondent signed all the corporation's checks. The following exchange occurred between Mr. Walczak and Mr. Cowger:

'Q. And would it be a fair statement or you tell me who was—the bottom line, who was the boss—who was the boss of Little and Miller, Chartered when you were there? Forget about the titles, who was the boss.
'A. I don't know how to answer that. I mean, there was—I viewed it as no boss. We all kind of just worked together. I mean, I did the attorney work and Chris and Kathy did the other work. I mean, that's how I—
'Q. Who made the financial decisions?
'A. Well, that would have been Chris [Miller].'

Additionally, Mr. Cowger did not enjoy the profits of the corporation, he did not suffer the losses of the corporation, he did not engage in financial transactions in behalf of the corporation, nor did he manage the corporation.

"19.   On January 29, 2007, Mr. Emerson forwarded a copy of Disciplinary Administrator's Exhibit 2 to the Disciplinary Administrator, along with a letter of complaint. Kay Huff, attorney, was appointed to investigate this case. Ms. Huff

wrote to the Respondent and asked him to call to schedule an interview. When the Respondent called, Ms. Huff asked the Respondent to bring his file with him to the interview. The Respondent failed to bring his file with him to his interview with Ms. Huff. The Respondent never provided Ms. Huff with a copy of his file.

### "CONCLUSIONS OF LAW

"1. Based upon the findings of fact, the Hearing Panel concludes as a matter of law that the Respondent violated KRPC 5.5, KRPC 8.1(b), KRPC 8.4(a), and KRPC 8.4(g), as detailed below. [Footnote: The Respondent and his corporation owned some property referred to as 'the Pomona property.' Following the sale of the Pomona property, the Respondent deposited the settlement proceeds into his attorney trust account. While it is unclear when this transaction occurred and why the Respondent would continue to have an attorney trust account during the period of suspension, KRPC 1.15 prohibits the commingling of personal funds with client funds. Thus, the Hearing Panel believes that the Respondent violated KRPC 1.15, by commingling his funds with client funds, when he deposited the proceeds of the sale of the Pomona properties, in his attorney trust account. However, facts relating to this violation were not included in the Formal Complaint. Thus, the Hearing Panel makes no formal conclusion in this regard.]

"2. KRPC 5.5 provides:

'A lawyer shall not:

(a) practice law in a jurisdiction where doing so violates the regulation of the legal profession in that jurisdiction; or

(b) assist a person who is not a member of the bar in the performance of activity that constitutes the unauthorized practice of law.'

"The Respondent argued that he did not engage in the unauthorized practice of law.

"3. From time to time, the Supreme Court has considered what constitutes the practice of law:

'In determining what constitutes the "practice of law" no precise, all-encompassing definition is advisable, even if it were possible. Every matter asserting the unauthorized practice of law must be considered on its own facts on a case-by-case basis. . . .

"As the term is generally understood, the practice of law is the doing or performing of services in a court of justice, in any matter depending therein, throughout its various stages, and in conformity to the adopted rules of procedure. But in a larger sense it includes legal advice and counsel, and the preparation of legal instruments and contracts by which legal rights are secured, although such matter may or may not be depending in a court." *State, ex rel., v. Perkins,* 138 Kan. 899, 907, 908, 28 P.2d 765 (1934).'

'The court, in *Perkins,* also pointed out that "[o]ne who confers with clients, advises them as to their legal rights, and then takes the business to an attorney and arranges with him to look after it in court is engaged in the practice of law." 138 Kan. at 908[, 28 P.2d 765]. The quotation from the

*Eley* [*v. Miller*, 7 Ind. App. 529, 34 N.E. 836 (1893)] case has been adopted as the general rule in 7 C.J.S., *Attorney and Client*, § 3g (1937).

'A more recent source defines the practice of law as "the rendition of services requiring the knowledge and application of legal principles and technique to serve the interests of another with his consent." *R.J. Edwards, Inc. v. Hert*, 504 P.2d 407, 416 (Okla., 1972).'

*State ex rel. Stephan v. Williams*, 246 Kan. 681, 689 (1990).

"4.    Following the Respondent's suspension from the practice of law, the Respondent did not alter his conduct much. The Respondent simply changed the signature line on letters and pleadings. The Respondent also hired Mr. Cowger to review and sign letters, review and sign pleadings, and make court appearances.

"5.    In *In re Wilkinson*, the Court considered what a suspended or disbarred attorney may do when he is employed by a licensed attorney. In that case, the Court said:

'MRPC 5.3 (1991 Kan. Ct. R. Annot. 292) concerns an attorney's responsibility for nonlawyer assistants. The Comment accompanying MRPC 5.3 provides:

"Lawyers generally employ assistants in their practice, including secretaries, investigators, law student interns, and paraprofessionals. Such assistants, whether employees or independent contractors, act for the lawyer in rendition of the lawyer's professional services. A lawyer should give such assistants appropriate instruction and supervision concerning the ethical aspects of their employment, particularly regarding the obligation not to disclose information relating to representation of the client and should be responsible for their work product. The measures employed in supervising nonlawyers should take account of the fact that they do not have legal training and are not subject to professional discipline."

'The disciplinary administrator maintains MRPC 5.3 is not applicable to suspended attorneys, arguing that "nonlawyer assistant" plainly means someone who is not an attorney and that Wilkinson, although suspended, still retains his designation as an attorney. The disciplinary administrator relies upon *State v. Schumacher*, 214 Kan. 1, 519 P.2d 1116 (1974), in which this court discussed the status of a suspended attorney:

"Just as every lawyer should avoid even the appearance of professional impropriety, a suspended attorney should avoid the appearance of failure to comply with the court's order. The Nebraska Supreme Court has suggested that this means he must refrain from the things which he did as an attorney even though he might legally do them as a layman:

It seems clear to us that the doing of such work is within the province of a lawyer to do. It is properly identified as the practice of law, whether or not it might under some circumstances be properly performed by others not admitted to the bar. An order of suspension deprives the suspended lawyer from performing any service recognized as the practice of law. . . . A suspended lawyer will not be heard to say that services

recognized as within the practice of law were performed in some other capacity when he is called to account. *State ex rel. Nebraska State Bar Assn. v. Butterfield,* 172 Neb. 645, 649, 111 N.W.2d 543 (1961)." 214 Kan. at 10-11[, 519 P.2d 1116.']

251 Kan. 546, 548-49 (1992).

"6. Rather than going to work for an attorney, the Respondent appears to have hired an attorney to continue his legal work for him. The supervision that is required by the rules was not present in this case.

"7. At the hearing on this matter, the Respondent, through his counsel, argued that the arrangement between Mr. Cowger and the Respondent benefitted Mr. Cowger as he did not have to pay office over-head or staff salaries. However, if Mr. Cowger truly owned the corporation, and if the corporation paid the over-head and the staff salaries, then Mr. Cowger was paying the over-head and he was paying staff salaries. The Respondent's argument in this regard supports the conclusion that Mr. Cowger did not own or operate the law firm, rather, the Respondent did.

"8. Based on all the evidence, the Hearing Panel concludes that the Respondent engaged in the unauthorized practice of law after his suspension. The Hearing Panel concludes that the Respondent set up a system which allowed him to continue to practice law by virtue of Mr. Cowger's license, in violation of the Kansas Supreme Court's order of suspension. Because the Respondent continued to practice law after his license to do so had been suspended, the Hearing Panel concludes that the Respondent violated KRPC 5.5.

"9. Lawyers must fully cooperate in disciplinary investigations. KRPC 8.1(b) provides the requirement in this regard. '[A] lawyer in connection with a . . . disciplinary matter, shall not: . . . knowingly fail to respond to a lawful demand for information from [a] . . . disciplinary authority, . . .' KRPC 8.1(b). The Respondent violated KRPC 8.1(b) when he failed to provide Ms. Huff with access to his file. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 8.1(b).

"10. 'It is professional misconduct for a lawyer to . . . [v]iolate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another.' In this case, the Respondent violated KRPC 5.5 by using Mr. Cowger's law license, all in violation of KRPC 8.4(a). By hiring Mr. Cowger, the Respondent was able to continue his practice of law in violation of the Kansas Supreme Court's order of suspension. As such, the Hearing Panel concludes that the Respondent violated KRPC 8.4(a).

"11. 'It is professional misconduct for a lawyer to . . . engage in any other conduct that adversely reflects on the lawyer's fitness to practice law.' KRPC 8.4(g). Circumventing the Kansas Supreme Court's order of suspension adversely reflects on the Respondent's fitness to practice law. As such, the Hearing Panel concludes that the Respondent violated KRPC 8.4(g).

"12. The Disciplinary Administrator also alleged that the Respondent violated KRPC 8.4(d). The Hearing Panel concludes that the Disciplinary Administrator

failed to establish, by clear and convincing evidence, that the Respondent violated KRPC 8.4(d).

## "AMERICAN BAR ASSOCIATION
## STANDARDS FOR IMPOSING LAWYER SANCTIONS

"In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"*Duty Violated.* The Respondent violated his duty to the legal profession.

"*Mental State.* The Respondent knowingly violated his duty.

"*Injury.* As a result of the Respondent's misconduct, the Respondent caused potential injury to the legal profession.

"*Aggravating or Mitigating Factors.* Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factors present:

"*Prior Disciplinary Offenses.* On December 8, 2006, the Kansas Supreme Court suspended the Respondent's license to practice law for having violated KRPC 1.5(a), KRPC 3.1, and KRPC 8.4(c). *In re Miller,* 282 Kan. 689 (2006).

"*Dishonest or Selfish Motive.* The Respondent's conduct in his regard was motivated by dishonesty. It is dishonest to continue to run a law practice by using another's license.

"*A Pattern of Misconduct.* The Respondent engaged in a pattern of misconduct by establishing a system to circumvent the Kansas Supreme Court's order of suspension. By employing Mr. Cowger, the Respondent was able to continue to run his practice through Mr. Cowger.

"*Bad Faith Obstruction of the Disciplinary Proceeding by Intentionally Failing to Comply with Rules or Orders of the Disciplinary Process.* The Respondent failed to provide access to his file to Ms. Huff, the attorney investigator.

"*Refusal to Acknowledge Wrongful Nature of Conduct.* The Respondent refused to admit that he engaged in any misconduct.

"*Substantial Experience in the Practice of Law.* The Respondent was licensed to practice law in 1984. At the time of his suspension, he had practiced law for 22 years.

"Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found no mitigating circumstances present.

"In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered the following ABA Standards:

'6.22 Suspension is appropriate when a lawyer knowingly violates a court order or rule, and there is injury or potential injury to a client or a party, or interference or potential interference with a legal proceeding.

'8.1 Disbarment is generally appropriate when a lawyer:

(a) intentionally or knowingly violates the terms of a prior disciplinary order and such violation causes injury or potential injury to a client, the public, the legal system, or the profession;

or

(b) has been suspended for the same or similar misconduct, and intentionally or knowingly engages in further acts of misconduct that cause injury or potential injury to a client, the public, the legal system, or the profession.'

### "RECOMMENDATION

"The Disciplinary Administrator recommended that the Respondent be disbarred. Counsel for the Respondent argued that he did not engage in the unauthorized practice of law and the complaint should be dismissed. Counsel for the Respondent acknowledged, however, that if the Hearing Panel and, ultimately, the Kansas Supreme Court, conclude that the Respondent engaged in the unauthorized practice of law, the outcome of the case, pursuant to Kan. Sup. Ct. R. 218(c), would be disbarment.

"Kan. Sup. Ct. R. 218(c) provides that 'violation of any suspension order shall constitute grounds for disbarment.' Thus, based upon the findings of fact, conclusions of law, and the Standards listed above, the Hearing Panel unanimously recommends that the Respondent be disbarred.

"Costs are assessed against the Respondent in an amount to be certified by the Office of the Disciplinary Administrator."

## RESPONDENT'S EXCEPTIONS

On December 21, 2009, the respondent filed exceptions to the panel's final hearing report. See Supreme Court Rule 212(c) (2009 Kan. Ct. R. Annot 337). Without further elaboration, the pleading recited that

"Respondent objects and files exceptions to the findings of fact contained in paragraphs 16, 18, and 19, in that those findings were not proven by clear and convincing evidence; and to the conclusions of law contained in paragraphs 1, 4, 6, 7, 8, 9, 10, and 11, in that those findings were neither proven by clear and convincing evidence, nor do they represent a correct interpretation of the law applicable to such matters."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary hearing panel, and the arguments of the parties and determines whether violations of the KRPC exist

and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009); see Supreme Court Rule 211(f) (2009 Kan. Ct. R. Annot. 321). Clear and convincing evidence is " 'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable." ' " *In re Lober*, 288 Kan. at 505 (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

In his briefing to this court, the respondent does not specifically explain his exceptions to the panel's factual findings in paragraphs 16, 18, and 19 of the final hearing report. See *In re Bishop*, 285 Kan. 1097, 1106, 179 P.3d 1096 (2008) (a respondent who does not advance arguments or provide record citations to support exceptions to the final hearing report is deemed to have abandoned the exceptions). Nevertheless, we note that the first two paragraphs, 16 and 18, consist principally of quotations from the hearing transcript, which clearly support the findings made in those paragraphs. Paragraph 19 essentially states that Miller never provided the investigating officer with the case file she requested, which is not only supported by clear and convincing evidence, but is uncontroverted. While Miller proffers a reason for not providing the case file, he does not contend that it was, in fact, provided.

Miller's brief suggests that his case boils down to a determination of two issues: (1) whether he practiced law during the period of his license suspension, either individually or through another attorney, Chris Cowger; and (2) whether he failed to cooperate in the investigation of the complaint against him. He argues that both issues should be resolved in his favor.

*Unauthorized Practice of Law*

Miller contends that he did exactly what a suspended attorney is supposed to do: he sent letters to his clients, filed pleadings to withdraw from his pending court cases, transferred ownership of his professional corporation to a licensed attorney, and thereafter functioned solely in the capacity of a law clerk or legal assistant. In contrast, the Disciplinary Administrator essentially characterizes Miller's actions as purchasing the use of Cowger's law license to

continue Miller's law practice during his suspension period. The clear and convincing evidence supports the Disciplinary Administrator's position and the hearing panel's conclusions.

"[A]n attorney suspended from the practice of law cannot hold himself or herself out to be an attorney, either through signing letters and pleadings or appearing in court; cannot counsel clients about legal matters; and cannot maintain or retain clients." *In re Wilkinson,* 251 Kan. 546, 553, 834 P.2d 1356 (1992). Miller concedes that he failed to completely avoid the appearance that he was continuing to practice law. See *State v. Schumacher,* 214 Kan. 1, 10, 519 P.2d 1116 (1974) ("a suspended attorney should avoid the appearance of failure to comply with the court's [suspension] order"). For some time after his suspension, Miller maintained an exterior sign at the law office where Cowger was ostensibly practicing that identified Miller as an attorney. He admittedly used letterhead indicating that he was an attorney and recited in a letter to opposing counsel that he, Chris Miller, represented the client and was sending the letter for the firm. We have previously found that similar conduct supported a conclusion that the respondent engaged in the unauthorized practice of law. See *In re Rost,* 289 Kan. 290, 306-07, 211 P.3d 145 (2009). Exacerbating the possibility of public confusion, the representation of the clients was continued under the same firm name, Little and Miller, Chartered, and at the same location. Further, Miller continued to talk with his former clients on the telephone, albeit he contends he was functioning only as a receptionist.

More importantly, however, the role that Cowger assumed with respect to Miller's former practice is inconsistent with the notion that Miller was only engaging in conduct which is permissible for a suspended attorney. The hearing panel found that the professional corporation, Little and Miller, Chartered, treated Cowger as if he were an independent contractor. Miller does not challenge that finding, and it is supported by clear and convincing evidence.

Cowger worked for Little and Miller, Chartered from December 14, 2006, until early December 2007, when the Kansas Supreme Court temporarily suspended his law license. On May 9, 2008, Cowger was disbarred. *In re Cowger,* 286 Kan. 52, 182 P.3d 1204

(2008). Cowger testified that his arrangement with Miller was for him to receive $70 per hour for the time he actually spent working on the firm's cases. The corporate records are consistent with that testimony. For calendar year 2007, the corporation issued Cowger an Internal Revenue Service (IRS) Form 1099-MISC, reflecting that the corporation had paid Cowger $19,637 during the year. The corporation did not deduct withholding taxes or social security taxes from Cowger's pay. A former IRS employee testified that IRS Form 1099-MISC is utilized to report a number of things, including nonemployee compensation paid to independent contractors. The form is not used for employee wages, which are reported on a W-2 form; nor is the 1099-MISC used for distributions to corporate shareholders, which are reported on a K-1 form.

In 2007, the corporation collected net attorney fees of over $100,000, after payment of expenses. The bulk of the money was paid to Miller, ostensibly as salary, rental payments on the building and vehicles, and repayment of loans Miller made to the corporation. Miller controlled all of the financial affairs of the corporation. Cowger testified that his only concern was getting paid his hourly fee and that he did not consciously or knowingly have any interest in the corporate operations. The assertion that Cowger functioned as an independent contractor is, at least, highly probable.

The fundamental problem with the independent contractor arrangement is that, following Miller's suspension, neither he nor his professional corporation had the authority to contract for Cowger's services on the Little and Miller files. A suspended attorney is unable to undertake any further representation of a client after the effective date of the suspension order. Supreme Court Rule 218(a) (2009 Kan. Ct. R. Annot. 361). Obviously, then, the suspended attorney cannot hire an independent contractor to do the legal work which the suspended attorney is precluded from doing.

K.S.A. 17-2715 clarifies that a professional corporation does not affect the professional relationship between a person rendering professional services and a person receiving those services. Accordingly, if a shareholder or employee of the professional corporation does not have a valid attorney-client relationship in a case,

then the corporation cannot separately have such a relationship, so as to have the right to contract for someone to do legal work on the file.

Miller's suggestion that he legitimized the arrangement by gifting the corporation to Cowger is legally unavailing and factually incredible. Such a transfer would have made Cowger the sole qualifying shareholder of the professional corporation. See K.S.A. 17-2712 (only duly licensed persons can be shareholders of a professional corporation); K.S.A. 17-2713 (only a shareholder can be a director or officer, other than secretary, of a professional corporation). As noted, the duties, rights, and privileges of an attorney-client relationship would have existed between Cowger and the client. K.S.A. 17-2715. He could not be both the responsible attorney and an independent contractor of the corporation on the same files.

Moreover, it is not entirely clear that it is statutorily permissible to resurrect the validity of a professional corporation after the disqualification of the sole shareholder by gifting the corporate shares to a qualified person. K.S.A. 17-2714 provides that upon the disqualification of the last qualifying shareholder, the professional corporation shall become a general business corporation and can amend its articles of incorporation to perform such functions as collecting accounts receivables, paying corporate debts, and otherwise winding up its affairs or conducting any business or activity which is permitted under the Kansas general corporation code. K.S.A. 17-2719 provides for the automatic forfeiture of the certificate of incorporation for a professional corporation if any shares of the corporation have been owned by an unqualified person for more than a year and no action has been timely instituted to fix the fair value of such shares. Further, it is unclear what role the regulating professional board might have in approving the name of a professional corporation when all of the corporate shares have been transferred. See K.S.A. 17-2709 (regulating professional board to certify its approval of proposed corporate name upon initial incorporation); K.S.A. 17-2712 (only requiring regulating board certification that transferee of professional corporation shares is duly licensed).

Nevertheless, the contention that Miller gifted the shares of Little and Miller, Chartered to Cowger is belied by the evidence. Cowger unequivocally said he was not a shareholder and he did not believe he was an officer of the corporation. He did not recall attending any corporate meetings or discussing the operation of the corporation with Miller. When questioned about corporate papers he might have signed, Cowger candidly admitted that he did not know what they were; that all he cared about was getting paid the $70 per hour; and that what went on with the corporation had no impact or bearing on him. Moreover, Miller's personal handling of all of the corporate finances corroborated Cowger's testimony that he was uninvolved in the corporation. Curiously, in 2008, after Cowger lost his law license, Miller filed papers with the Secretary of State which indicated that Miller owned the corporation. We have no explanation as to how someone that is unaware that he or she has been gifted corporate shares could form the donative intent to re-gift them. In short, Cowger did not accept the alleged gift of the corporate shares of Little and Miller, Chartered and did not assume ownership and control of the corporation.

Finally, we address Miller's contention that the legal work he performed individually during his suspension was solely in the capacity of a law clerk, legal assistant, or receptionist. *In re Wilkinson*, 251 Kan. at 553, established that

"an attorney who has been disbarred or suspended from the practice of law is permitted to work as a law clerk, investigator, paralegal, or in any capacity as a lay person for a *licensed attorney-employer* if the suspended lawyer's functions are limited exclusively to work of a preparatory nature *under the supervision of a licensed attorney-employer* and does not involve client contact." (Emphasis added.)

Miller argues that his work was of a preparatory nature and that his client contact was restricted to answering the firm telephone as a receptionist.

The problem here is more fundamental than the nature of the work Miller performed. Given the uncontroverted finding that Cowger was an independent contractor of the professional corporation, he would not be Miller's "attorney-employer." To the contrary, Miller was an employee of the professional corporation. Or-

dinarily, an independent contractor of a corporation would have no authority to supervise and direct the actions of the corporation's employees. Here, Cowger confirmed that his responsibilities were limited to his contractual obligation and that he had no corporate responsibilities. That left Miller working for the corporation without attorney supervision. A suspended attorney cannot function independently as a law clerk or paralegal; he or she must work for and be supervised by a licensed attorney who is ultimately responsible for the paralegal work. See *In re Rost*, 289 Kan. at 308 (arrangement where suspended attorney agreed to sell licensed attorney his client base and suspended attorney would continue to provide administrative assistance was not an employer-employee relationship and not permissible); KRPC 5.3(b) and (c) (2009 Kan. Ct. R. Annot. 576) (responsibilities and liability of supervising attorney).

In conclusion, we find that Miller engaged in the unauthorized practice of law, in violation of KRPC 5.5 (2009 Kan. Ct. R. Annot. 580). Further, Miller's actions constituted a violation of KRPC 8.4(a) (2009 Kan. Ct. R. Annot. 602), as explained in the final hearing report.

*Failure to Cooperate*

Pursuant to KRPC 8.1(b) (2009 Kan. Ct. R. Annot. 594), an attorney shall not knowingly fail to respond to a lawful demand for information from a disciplinary authority in connection with a disciplinary matter. The hearing panel found that when Miller failed to provide the Disciplinary Administrator's investigator with access to the requested case file, he violated that rule.

Before this court, Miller does not deny that he failed to provide the requested case file. Rather, he argues that, at the time of the request, the file had been transferred to and was under the control of Cowger, so that Miller had no authority to give the file to anyone. That position might have been more availing had it been proffered at the time of the request. However, the investigator related that Miller's excuse for failing to bring the file to their meeting was that he had looked in the file and it did not contain the letter he believed the investigator was seeking. Accordingly, we find that Miller's re-

fusal to provide the requested information was, at that time, a failure to cooperate in the investigation and, thus, a violation of KRPC 8.1(b).

*Appropriate Discipline*

Having determined that Miller engaged in the unauthorized practice of law while his license to practice law was suspended, we turn to the appropriate disposition. As noted, the hearing panel recommends disbarment. The panel's recommendation on disposition is advisory only and does not prevent the court from imposing a different sanction. See *In re Cline*, 289 Kan. 834, 846, 217 P.3d 455 (2009); Supreme Court Rule 212(f) (2009 Kan. Ct. R. Annot. 337). However, as the panel noted and Miller concedes, our rules provide that a "[v]iolation of any suspension order shall constitute grounds for disbarment." Supreme Court Rule 218(c) (2009 Kan. Ct. R. Annot. 361). Moreover, we do not view Miller's conduct to be an inadvertent violation, but rather a carefully planned scheme to circumvent the suspension order in order to continue his law practice. Accordingly, we accept the recommendation for disbarment.

## ORDER OF DISCIPLINE

IT IS THEREFORE ORDERED that respondent, Christopher R. Miller, be and he is hereby disbarred from the practice of law in the state of Kansas in accordance with Supreme Court Rule 203(a)(1) (2009 Kan. Ct. R. Annot. 272).

IT IS FURTHER ORDERED that respondent shall comply with the provisions of Supreme Court Rule 218; that the costs of these proceedings be assessed to the respondent; and that this opinion be published in the official Kansas Reports.

DAVIS, C.J., and BILES, J., not participating.

RICHARD B. WALKER, District Judge, and GARY L. NAFZIGER, District Judge, assigned.